Noah H. LUNDY, Petitioner–Appellee,

v.

Donal CAMPBELL and Charles W. Burson, Respondents–Appellants.

No. 88–6257.

United States Court of Appeals, Sixth Circuit.

Argued June 9, 1989.

Decided Nov. 1, 1989.

Rehearing and Rehearing En Banc Denied Dec. 18, 1989.

Noah Harrison Lundy, Turney Center Industrial Prison, Only, Tenn., pro se.

Donald E. Dawson, Searcy, Smith & Dawson, Nashville, Tenn., for petitioner-appellee.

Jerry Smith, Norma Crippen Ballard, Asst. Attys. Gen., Charles W. Burson, Atty. Gen., Nashville, Tenn., for respondents-appellants.

Before: GUY and RYAN, Circuit Judges; and DOWD, District Judge.*

RYAN, Circuit Judge.

In this case we review, *de novo*, the judgment of the district court granting a writ of habeas corpus upon its determination that the petitioner's state trial was fundamentally unfair in violation of his right to due process. We respectfully disagree, and reverse.

## I.

Noah H. Lundy was convicted in a Tennessee state court in August 1973 of two felonies, rape and crime against nature. He was sentenced by the jury to confinement for 120 years for the rape offense and five to fifteen years for the crime against nature offense, the sentences to run consecutively. The case has been in litigation and in the appellate process, in both state and federal courts, including the United States Supreme Court, continuously for sixteen years. Students of federal criminal procedure will recognize this case as the latest judicial episode of the famous *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), in which the Supreme Court announced the current rule concerning the exhaustion of state court remedies in so-called "mixed petitions" for habeas corpus relief. The case has been through every level of the Tennessee trial and appellate process three times, to the federal district court and this court twice, and to the United States Supreme Court once. The district court judgment we now review directs that petitioner be discharged from custody unless the state of Tennessee grants him a new trial to be conducted, if at all, almost seventeen years after the events in question.[1]

---

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1. Lundy was convicted in August 1973 following a jury trial in the Criminal Court of Knox County, Tennessee. The conviction was affirmed on direct appeal by the Tennessee Court of Criminal Appeals. *Lundy v. State*, 521 S.W.2d 591 (Tenn.Crim.App.1974). The Tennessee Supreme Court denied his application for permission to appeal. Lundy then filed a petition for postconviction relief in the Criminal Court of Knox County, the petition was denied, and he took no appeal of the denial. On February 15, 1979, Lundy filed his first petition for a writ of habeas corpus in the district court. The district court issued the writ finding that the trial court's rulings limiting the cross-examination of the prosecutrix, and the prosecutor's improper argument and comments in the jury's presence, violated Lundy's sixth amendment right of confrontation and fourteenth amendment right to due process, respectively. The district court acknowledged that Lundy had not exhausted all of his claims in the state court. This court affirmed in a brief unpublished opinion and rejected Tennessee's non-exhaustion argument. *Lundy v. Rose*, 624 F.2d 1100 (6th Cir.1980). The Supreme Court reversed, holding that where a petitioner lists both exhausted and unexhausted grounds for relief, the entire petition must be dismissed. *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). Lundy therefore returned to the state courts of Tennessee, filing a petition for post-conviction relief with the Criminal Court of Knox County

Manifestly, the case is a classic example of the criminal justice process gone awry. If the district court is correct in holding that Lundy's trial was devoid of the minimal fundamental fairness guaranteed by the due process clause of the fourteenth amendment, he is, without question, entitled to have his jury conviction vacated and the sentence set aside. If that is the constitutionally mandated result, it is a travesty of justice that Lundy has been required to serve sixteen years of prison confinement upon a constitutionally invalid conviction. In ordinary circumstances, that grave injustice would be ameliorated by the state's entitlement to reprosecute a defendant, and, if he is convicted, credit him with the time already served when a new sentence is imposed. Should the requirements of the Constitution mandate that Lundy's conviction be set aside and the case remanded to the state of Tennessee for a new trial, the reality of the matter is that if reprosecution is feasible at all, it will be undertaken seventeen years after the alleged offense was committed and, perforce, offer little likelihood that the truth determination process will operate in the fashion envisioned by the authors of the fourteenth amendment due process clause, in the name of which such new trial would be conducted. Neither Lundy, the state of Tennessee, the criminal justice system, nor the federal constitutional principles in support of which we undertake today's duty have been well served no matter what the outcome in this sixteen-year-old litigation.

It is not a matter of assigning blame for the unconscionable delay in finally resolving this case—certainly the district court below cannot be faulted for being revisited with a case it first decided nine years earlier. It is a matter of recognizing that the administration of justice requires efficient and expeditious case management, without duplication of judicial effort and function. Sadly, none of those goals were achieved in this case.

Notwithstanding all of this, we approach our review of the district court's judgment, guided solely by our duty to determine, as best we can, whether Lundy's trial was so devoid of fundamental fairness to be constitutionally invalid under the fourteenth amendment, and we do so without regard to the outcome to which that determination leads us.

## II.

Before conducting such a review, however, we first make some preliminary observations concerning our standard of review and the deference we believe must be accorded the courts of Tennessee, which have passed upon all the assignments of error presented to us today and determined them not to amount to a denial of due process.

## A.

The preliminary or threshold standard by which we review the district court's judgment is *de novo*, but with complete deference to evidence-supported state court findings of fact. *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982); *Blackburn v. Foltz*, 828 F.2d 1177, 1181 (6th Cir.1987), *cert. denied*, 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988). But the more substantive standard by which our *de novo* review is conducted is the determination whether the trial errors asserted by the petitioner resulted in a trial so devoid of fairness as to have amounted to a denial of the due process guaranteed by the fourteenth amendment. When federal courts sit in judgment of state court determinations whether fourteenth amendment due process guarantees have been

on July 6, 1982. The court denied the petition, and the Tennessee Court of Criminal Appeals affirmed. However, on June 4, 1984, the Tennessee Supreme Court reversed, and remanded for further proceedings. Following a hearing conducted in February 1986, the Criminal Court of Knox County again dismissed Lundy's petition for post-conviction relief, and, in December 1987, the Tennessee Court of Criminal Appeals again affirmed. *Lundy v. State*, 752 S.W.2d 98 (Tenn.Crim.App.1987). On March 14, 1988, the Tennessee Supreme Court denied permission to appeal. His state remedies finally exhausted, Lundy returned once again to the district court, filing the instant petition for habeas corpus on May 21, 1988. The district court again granted Lundy's petition on September 21, 1988, and this appeal followed.

provided to state-tried defendants—reviewing the same federal constitutional errors our state court colleagues have reviewed, we do so in accordance with the same criteria defining due process that guided the state courts. The principles of federalism that empower us to do what the state courts have already done surely cannot mean that federal judges may vacate state court judgments simply because we feel differently about how fair the state trial was, or ought to have been, than did the many state judges who reviewed the case. The courts of the state of Tennessee believed that the petitioner was not denied the fundamental fairness assured him under the fourteenth amendment due process clause. The district court, after examining the same assignments of error considered by the state courts, and evaluating them according to the same due process standards that bind all courts, concluded otherwise. Unquestionably, that judgment was the district court's conscientious, judicial assessment, issued from a firm, if ill-defined, conclusion that the accumulated errors it identified rendered the trial so unfair as to have denied the petitioner the process guaranteed him by the fourteenth amendment. The district court's conclusion that the trial denied the defendant due process is "ill-defined," and perhaps understandably so, because the district court has provided no explanation of its understanding of what process the defendant was due and was denied, except to observe, several times, that the trial errors it cited denied the defendant a "fair trial," and that, as a result of the cumulative effect of the errors, "the jury was too tainted and inflamed to be able to give the petitioner a fair trial." Perhaps the district court cannot be expected to be any more specific.

Tomes have been written about the meaning of due process under the fourteenth amendment. But we have searched in vain for any useful, authoritative statement by the Supreme Court, or by the countless other writers who have addressed the subject, defining the elements, the criteria, the immutable components of a fair trial within the meaning of the due process clause of the fourteenth amendment. The accumulated precedent and scholarship on the subject instructs us that procedural due process is, in the last analysis, simply the court's notion of "fundamental fairness," *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), and compliance with the principles "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 151, 82 L.Ed. 288 (1938).

Given standards of that generality for determining whether a state criminal case defendant was accorded due process of law, it can hardly be said that a lower court has "erred" when a reviewing court, acting *de novo*, disagrees with it; rather, the best that can be said is that, to paraphrase Justice Robert Jackson, the reviewing court is not correct because it is "fairer"; it is correct only because it is the "reviewer." *Brown v. Allen*, 344 U.S. 443, 540, 73 S.Ct. 397, 427, 97 L.Ed. 469 (1953) (Jackson, J., concurring).

Our duty then is to examine for ourselves the grounds for relief asserted by the petitioner, defer entirely to the Tennessee courts' evidence-supported findings of fact relating to each, determine for ourselves whether the "mistakes," as the district court characterized them, found to have been committed by the prosecutor and the trial court amounted to legal error, and then decide whether, as a result of these "mistakes," taken separately or in combination, "the jury was too tainted and inflamed to be able to give the petitioner [the] fair trial" contemplated by the due process clause of the fourteenth amendment.[2]

### B.

There is another factor which bears upon our review today. Prior to 1953, federal

---

**2.** To give some meaning to our function as a reviewing court, we accept the district court's conclusion that "due process" or "fundamental fairness" was denied and the "principles implicit in our concept of ordered liberty" violated in this case, if, because of the errors complained of, Lundy's jury was too "tainted and inflamed to be able to give the petitioner a fair trial."

courts could not issue writs of habeas corpus on the basis of a federal constitutional claim when the state courts had previously addressed the claim unless the petitioner could show that the state courts "had failed to provide adequate 'corrective process' for the full and fair litigation of federal claims...." *Stone v. Powell,* 428 U.S. 465, 476, 96 S.Ct. 3037, 3043, 49 L.Ed.2d 1067 (1976) (quoting *Frank v. Mangum,* 237 U.S. 309, 333–36, 35 S.Ct. 582, 589–91, 59 L.Ed. 969 (1915)). With its decision in *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), however, the Supreme Court greatly expanded the scope of the federal inquiry on habeas into state court resolution of constitutional questions. Although state determinations on questions of fact still enjoy a statutory presumption of correctness, 28 U.S.C.A. § 2254(d) (1977), it is generally accepted that the federal courts may conduct a full review of state court decisions on federal constitutional law. *See, e.g., Smith v. Sowders,* 848 F.2d 735, 738 (6th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 169, 102 L.Ed.2d 139 (1988).

That is not to say, however, that federal courts have been issued a writ of general superintendence over state courts on federal constitutional questions. Nothing in *Brown* suggests that the district court, or this court, is any wiser, better trained in constitutional law, or more firmly committed to the precepts of the federal constitution than are the many judges of the three levels of Tennessee state courts who have considered the same federal constitutional claims we examine again today.

In cases such as this one, where the record indicates that state appellate courts have carefully considered and resolved the same federal constitutional issues later raised on habeas in a federal court, we think it is especially important for the federal court to consider carefully and respectfully the state court's judgment. At the close of the term just ended, Justice O'Connor recognized the cost habeas review imposes upon federalism:

> As in this case, lower federal courts often sit in "review" of the judgments of the highest courts of a state judicial system. This situation has always been a flashpoint of tension in the delicate relationship of the federal and state courts, and this exercise of federal power should not be undertaken lightly where no significant federal values are at stake.

*Duckworth v. Eagan,* — U.S. —, —, 109 S.Ct. 2875, 2884, 106 L.Ed.2d 166 (1989) (O'Connor, J., concurring). We emphasize that our call for appropriate regard for state court decisions in no way abrogates the federal court's responsibility to make the final determination on questions of federal constitutional law. We merely note that state determinations on federal constitutional questions should be accorded the respect to which the final judgment of a sovereign state is entitled.

We believe that the appeal before us today provides a good illustration of the kind of case in which the federal courts should consider carefully and respectfully the rulings of the state appellate courts. As will be seen more clearly later, the six assignments of error alleged to have resulted in a denial of constitutionally guaranteed due process in this case are claims of prosecutorial misconduct and trial court error relating to the observance of ethical canons, evidentiary rulings, and state trial court procedures and practices with which the Tennessee courts are particularly familiar. The trial and appellate courts of Tennessee exhaustively examined petitioner's claims both on direct appeal and during post-conviction proceedings, and concluded that petitioner's trial was fundamentally fair. We proceed to our own independent evaluation of the matter, not at all bound by the conclusions reached by our state court colleagues or by our own colleagues, but respectful of their carefully considered and conflicting judgments about the trial errors alleged to have denied the petitioner due process of law.

### III.

The petition for habeas corpus presented to the district court identified six grounds for relief:

1. Remarks by the prosecuting attorney before the jury which reflected poorly on the defense counsel's integrity;
2. The trial court's ruling limiting the defendant's cross-examination of the prosecutrix;
3. Statements by the prosecuting attorney alluding to the defendant's violent nature;
4. The prosecutor's comments on the petitioner's failure to testify;
5. The prosecutor's numerous personal evaluations of the state's proofs; and
6. The trial court's instruction to the jury that every witness is presumed to tell the truth.

The district court found that none of the errors described in any of the grounds for relief it discussed (grounds 1, 2 and 3), considered individually, denied petitioner a fair trial, but that all three grounds, considered together, "may very well have prevented a fair trial and therefore be sufficient basis for a writ to issue." Moreover, the court added, "[w]hen viewed in conjunction with the statements behind the [fifth] ground, the conclusion is compelling ... [that] petitioner's constitutional right to a fair trial was violated." Finally, the district court held that "[b]ecause the grounds already discussed clearly created an overall environment in which a fair trial was impossible, it is unnecessary to address grounds 4 and 6." Despite so saying, however, the district court immediately added:

> The court does note, however, than [sic] any inherent problems in the indirect reference to the defendant's failure to testify by stating that "the only story we've heard ... came from the state's witnesses" [ground 4] were compounded by the erroneous limitation of cross-examination [ground 2]. The same is also true for the generally discouraged jury instruction that all witnesses are presumed to tell the truth [ground 6].

Our task, then, is to review the correctness of a lower court judgment which concludes that the defendant was denied a fair trial, for the reasons described in six individual assignments of error, three of which the court held did not, standing alone, warrant habeas relief, two others of which the court decided were unnecessary to discuss, but all six of which the district court analogized to a bundle of straws "which served to crush petitioner's right to a fair trial." Therefore, we are reviewing a judgment in which the lower court concluded, although it did not say so explicitly, that the "sum" of the errors in the trial proceedings is greater than the individual errors, and the "sum" resulted in the denial of due process.[3] We know of no other way to review such a judgment than to examine each of the petitioner's six grounds for relief separately, determine their individual effect upon the fairness of the trial, and then, as the district court did, assess the collective or cumulative impact of the alleged errors upon the fairness of the trial.

In approaching our task of evaluating the fairness of the trial, we are obligated to keep in mind that it is the whole trial that is evaluated, not simply the six isolated instances cited to us by the petitioner. As we held in *Payne v. Janasz*, 711 F.2d 1305, 1310 (6th Cir.), *cert. denied*, 464 U.S. 1019, 104 S.Ct. 552, 78 L.Ed.2d 726 (1983), to warrant habeas relief "errors must be of constitutional proportion and, *taken as a whole and within the context of the entire record*, have caused the substantial rights of the petitioner as secured by the Fourteenth Amendment to have been infringed." (Emphasis added; citations omitted.) The "entire record" refers to all that occurred from the empanelment of the jury to the return of the verdict and includes, *inter alia*, the quality and quantity of the evidence of the defendant's guilt; the extent to which the substantive evidence of guilt produced by the prosecution was consistent or inconsistent, contradicted or uncontradicted, weak or forceful, and clear or vague; the manner in which the evidence was presented; the apparent independence,

---

**3.** The district court's statement is:

Harmless error plus harmless error does not necessarily add up to harmless error. In this case, the sum is a violation of the fundamental right to a fair trial, even if no single act of misconduct would be enough cause for a writ to issue.

interest, or bias of the witnesses; the candor, clarity, and completeness of their testimony, including whether it was impeached; and everything the jury saw and heard, including the many objections, legal arguments, and evidentiary rulings that occurred in the jury's presence, as well as the court's instructions to the jury. The "entire record" also includes the extent to which petitioner's counsel objected to procedures that are now, following conviction, assailed as unfair.

In this case, the district court's opinion finding a denial of due process for accumulated procedural errors focuses almost exclusively upon the six assignments of error advanced by the petitioner. It provides a description of what occurred at trial with respect to each asserted error, an evaluation of the resultant harm, if any, and conclusions about the effect of each asserted error upon the fairness of the trial. The district court's opinion makes virtually no mention of the volume of uncontradicted incriminating evidence the jury heard, which described in vivid detail the grossly appalling sexual assault by the petitioner upon his victim. We make this observation not to suggest that an unfair trial is made fair simply because of the volume or force of the evidence of the accused's guilt or because such evidence is shocking. If the trial was fundamentally unfair, the conviction cannot stand no matter how repulsive and compelling the evidence of guilt. But it is, as we have said, the whole trial that we evaluate for fairness, not just the assignments of procedural error raised by the petitioner. The ultimate question we must answer is whether the asserted trial errors, measured according to the fundamental principles of a fair criminal process implicit in the due process clause of the fourteenth amendment, were so egregious as to have nullified the legitimacy of the properly admitted substantive evidence of the defendant's guilt.

The writer has read every word of the lengthy trial transcript, not merely the state and district court's opinions and the matters excerpted from the record in the joint appendix. The record presents a narrative of sexual abuse of the most depraved and disgusting sort, visited upon a young woman who was a complete stranger to the petitioner, who was imprisoned first in his automobile and later in his apartment, and who was made to submit to the petitioner's attack by intentional and repeated battery and by threats of even more severe physical harm should she fail to acquiesce in his demands. The reader wishing to verify this characterization of the evidence is invited to examine the facts of the case as adopted by the Tennessee Court of Criminal Appeals on direct appeal. 521 S.W.2d 591, 592–93 (Tenn Crim.App. 1974).

## IV.

We turn, then, to a seriatim review of the grounds relied upon by the district court for issuing its writ. Although the district court's opinion is not entirely clear, it appears, as we have said, that the court's decision is based upon only four of the six grounds asserted by the petitioner. Nevertheless, we review all six because the court apparently relied upon grounds 4 and 6 as additional "straws in the bundle which served to crush petitioner's right to a fair trial." Of the six grounds asserted by petitioner, one of them, ground 2, concerning the asserted limitation on the cross-examination of the prosecutrix, challenges a ruling of the trial court; another, ground 6, challenges a jury instruction; and the remaining four, grounds 1, 3, 4, and 5, charge improper conduct by the prosecuting attorney during the trial.

### A.

Ground 1: Remarks by the prosecuting attorney reflecting poorly upon defense counsel's integrity.

The context for this ground for relief is a point, early in the trial, at which the defense counsel, during cross-examination of the prosecutrix, sought to inquire whether, during a pretrial interview with defense counsel, she had made a statement inconsistent with her testimony concerning the number of times she had had intercourse

with persons other than the defendant.[4] After the effort at impeachment had failed because the witness stated she could not remember making the asserted prior inconsistent statement, a colloquy ensued between the prosecutor and the defense counsel, in relevant part, as follows:

[*Prosecutor*]: Your Honor, I want to object to that, because I consider the conversation he had with her—this young lady—completely improper. He didn't inform her who he was....

[*Defense counsel*]: What?

[*Prosecutor*]: ... he didn't inform her who he was, he didn't tell her she had a right to have counsel present, he didn't do anything. He got her down there

.    .    .    .    .

[*Defense Counsel*]: (Inaudible)

[*Prosecutor*]: She's telling the truth on the stand—and he got her down there, and now he's trying to make use of that conversation, which was completely improper, and I object to any reference to that conversation or any attempt to use it to impeach on cross-examination.

[*Defense Counsel*]: If I may, Your Honor, I don't like the inference that counsel got her down there and tried to twist her arm. As the Court knows, counsel in all cases try to contact the witnesses and find out what they know, and that's what I did in this case. It happens in 99 percent of the cases in this court.

[*Prosecutor*]: In most cases, Your Honor, that I'm familiar with, I believe the proper thing to do is that counsel inform the people they're talking to the people who they represent, which did not happen in this incident. This young lady did not know who she was talking to at the time she was talking to him.

The district court stated:

Ignoring for the moment the erroneous exclusion of this attempt to impeach the chief state witness, the clear impact of this entire exchange between the judge and the attorneys was to convey to the jury the impression that the defense

attorney went about his work in an underhanded way. The prosecutor twice characterized defense counsel's actions as "completely improper." The jury also got a double dose of "He [defense counsel] got her down there," a somewhat unclear statement, yet one that undoubtedly conveys an impression of improper coercion. Added to that was the prosecutor's own evaluation of what was normal and what was proper under these circumstances. Furthermore, the declaration that defense counsel did not tell the prosecutrix who he was and that he did not tell her she had a right to have counsel present during the conversation implied to the jury that such a right did exist. The inevitable conclusion was that defense counsel had engaged in wrongful conduct. Finally, since the court never informed the jury otherwise, and indeed even excluded the impeachment attempt, the jury was left with the impression that the prosecutor's allegations were correct.

Clearly the basis of this string of accusations was without foundation in the law. Just as clearly, unfounded accusations of improper conduct by defense counsel prejudices a defendant. Nevertheless, if painting defense counsel as a shady character were the only flaw in the record, this court would not find the mistake so critical as to have denied the defendant a fair trial, especially in the face of so much strong evidence for conviction. Unfortunately, however, other of petitioner's complaints are also well grounded in fact.

This assignment of error is the first of four allegations of prosecutorial misconduct. This court, sitting en banc, established the standard for reviewing allegations of prosecutorial misconduct on habeas:

Before habeas relief is granted, the prosecutor's statements must be so egregious as to render the trial fundamentally unfair. This determination is to be

---

**4.** The prosecution of this case took place prior to the enactment of Tennessee's Rape Shield Statute, Tenn.Code Ann. § 4–17–119 (1982), which severely limits the admissibility of such evidence.

made by evaluating the totality of the circumstances surrounding each individual case. Our Court has identified the factors we are to consider in weighing the extent of prosecutorial misconduct in habeas cases.

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*United States v. Leon,* 534 F.2d 667, 679 (6th Cir.1976).

*Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir.1982) (en banc) (citations omitted).

■ We agree entirely with the district court that, standing alone, the prosecutor's comments, quoted above, provided no basis for concluding that the defendant was denied a fair trial. Conceding that the prosecutor's objection to the attempted impeachment was utterly without merit, as we discuss more fully *infra,* it is nevertheless clear that the prosecutor's statements during the colloquy with defense counsel did not, as the district court observed, deny petitioner a fair trial. Quite aside from the fact that the prosecutor's incorrect description of the defense counsel's pretrial questioning of a witness as "clearly improper" was isolated, brief, and obviously stated for the purpose of supporting an evidentiary objection, it is manifest, given the strength of the evidence of the defendant's guilt of the crime charged, that the remarks could not have misled the jury or unfairly prejudiced the defendant. We suspect it would come as quite a surprise to the jurors to learn that their focus on the enormously inflammatory evidence of the defendant's conduct, essentially uncontradicted, could have been influenced to the defendant's unfair detriment in any way whatever by the short exchange between the lawyers in which the prosecutor accused the defense attorney of employing a "completely improper" procedure in interviewing the prosecutrix before trial. But whether the jurors paid any attention to that brief and,

we think, innocuous colloquy or not, we are perfectly satisfied that the prosecutor's comment neither misled the jurors, as the district court held, nor left them "too tainted" and too "influenced to be able to give the petitioner a fair trial." We are satisfied that the district court was correct in concluding that ground 1, standing alone, is not a basis for habeas relief.

## B.

Ground 2: Limiting the cross-examination of the prosecutrix.

This second asserted ground for relief derives from the same evidentiary objection and ensuing colloquy that is the basis for ground 1. The theory of this second claim, however, is that the trial court erred in sustaining the prosecutor's objection to the defense counsel's effort to impeach the complaining witness's veracity. As we indicated earlier, the defense counsel was attempting to demonstrate that, in the course of a pretrial interview with the defense counsel, the witness had made a statement, inconsistent with her trial testimony, admitting that she had sexual intercourse with her former boyfriend on ten to twenty occasions. The trial court ruled that the defense counsel could not ask the prosecutrix about her prior statement because, at the time of the interview with the prosecutrix, the defense counsel

> ... did not identify himself as to the fact that he was representing the defendant in this case, he did not make this identification to this witness prior to putting these questions to her ... [T]he court then sustains the objection.

and,

> Since you did not identify yourself as the attorney for Mr. Lundy, you will not ask her about what she may have told you in that [conversation].

■ As the state concedes, the trial court's ruling was patently erroneous. There was not in Tennessee, at the time of the trial, or is there now for that matter, any requirement that a defense counsel in a criminal case, before interviewing the complaining witness, identify himself as

representing the defendant. The ruling was incorrect, but the question before us is whether it was an error so egregious as to have denied the defendant a fair trial. We think it was not for a number of reasons.

While impeachment of the prosecutrix's veracity was, throughout the trial, the principal, indeed the only, weapon in the defense counsel's arsenal, the trial court's erroneous evidentiary ruling was upon a highly peripheral matter—whether she had made an earlier pretrial statement contradicting her trial testimony as to the number of times she had had sexual relations with her boyfriend prior to the alleged offense. The witness had testified that she had indeed had relations with the boyfriend during 1973, and stated that she did not "remember how many times." Even if the defense counsel had succeeded in getting the witness to acknowledge that she had earlier told him that she had relations ten to twenty times with the man, that would not have been admissible for its truth, as bearing adversely on her chastity, because the statement would have been an extrajudicial, unsworn statement not subject to cross-examination when made and, thus, inadmissible hearsay. *See, e.g., Tibbs v. Ake,* 505 S.W.2d 232, 235 (Tenn.1974) (quoting 29 Am.Jur.2d *Evidence* § 600), in which the court stated: " 'The hearsay rule, in general, renders inadmissible in evidence unsworn statements made out of court offered as proof of the fact asserted.' " Had the defense counsel obtained the answer he sought, it could have been considered by the jury solely for its worth as a prior inconsistent statement bearing on the witness' general veracity.

More importantly, however, when the trial court permitted the defense counsel to make a separate record of the proposed impeachment, outside the hearing of the jury, the witness testified, as she had before the jury, that she did not remember ever having told the defense counsel that she had had relations with the man ten to twenty times. The defense counsel did not suggest he had any extrinsic evidence of such a statement. Thus, while the trial court erred in cutting off the attempted impeachment, it developed that defense counsel was unable to lay the requisite foundation for the impeachment because he could not prove that the prior statement he attributed to the witness was ever made. Therefore, the erroneous ruling brought about the correct result but for the wrong evidentiary reason. Clearly, the defendant was not prejudiced and certainly was not denied a fundamentally fair trial. The district court recognized as much:

> Admittedly, the limitation of cross-examination in this case was not as crucial as often is the case. After the state presented its case, defense counsel was allowed to make an offer of proof in which he cross-examined the prosecutrix concerning her earlier statement. The impeachment attempt did not yield any devastating contradictions that would likely have had a significant impact on the jury. Accordingly, if this were the only ground offered by petitioner, the writ would be denied....

Since this ground for relief demonstrates no unfair prejudice whatever, we are at a loss to understand the district court's conclusion that while it is no basis for habeas relief standing alone, it is nevertheless "one straw of a bundle which served to crush the petitioner's right to a fair trial." In our view, if the "straws" are individual trial errors unfairly prejudicial to the defendant, the ruling here challenged under ground 2 is not part of that bundle.

### C.

Ground 3: Statements by the prosecuting attorney alluding to the defendant's violent nature.

During the prosecutor's direct examination of the defendant's fourteen-year old girlfriend who was present during the sexual assault upon the prosecutrix and who corroborated the prosecutrix's testimony, the following occurred:

Q. Did you ever see him mistreat your sister?

[*Defense Counsel* ]: Well, Your Honor, I really don't understand the materiality of all this.

[*The Prosecutor*]: Well, if you just give him time, I'm sure he'll figure it out.

*The Court:* Well....

[*The Prosecutor*]: Your Honor, if he wants me to explain it to him in front of the jury, I'll be glad to.

[*Defense Counsel*]: Your Honor, I don't know where he's trying to lead, but maybe we ought to let the jury step out and find out. I honestly do not know what he's trying to get to.

*The Court:* Very well, gentlemen, I sustain the objection on the basis that it is leading. You may take your time and develop your case, General.

Q. Tell the jury whether or not you ever witnessed any difficulties between your sister, while she was dating the defendant, and the defendant?

[*Defense Counsel*]: Your Honor, I still don't see the materiality of this as to....

[*Assistant Prosecutor*]: I would think the defendant's violent nature would be material to this case in light of what the victim has testified to.

[*Defense Counsel*]: Your Honor....

[*Assistant Prosecutor*]: I assume they claim that he's not this kind of person, and we're trying to show that he is. That's the materiality.

[*Defense Counsel*]: Your Honor, if I may finish my statement, I don't see any materiality to this case. He's charged in this case with rape and crime against nature.

[*Prosecutor*]: Are you finished now? I will explain, Your Honor. This young lady explained in detail that one of the reasons that she reacted the way she did was because of this advice she received from this young lady. I think it's proper to show why this young lady was given the advice she was.

[*Defense Counsel*]: Your Honor, I think we're going to get into a long dissertation of the proof of what witnesses said and what they're going to say and maybe we had ought to have the jury step out.

*The Court:* Very well.

The prosecutor's protestations to the contrary notwithstanding, the state was not entitled to prove that the defendant had previously mistreated the witness's sister in order to show the defendant's "violent nature" or to show "what kind of person ... he is." The defendant had not placed in issue his character for peaceableness and it was therefore not competent for the state to prove that he had, on a previous occasion, demonstrated a character trait for violence in order to show that he probably acted in conformance therewith on the occasion in question. After a hearing conducted in the jury's absence, the trial court concluded that the defendant's objection was well taken and properly instructed the jury that the defendant's objection was sustained and that the jury should disregard the prosecutor's comments:

> Ladies and Gentlemen of the jury, just prior to the time you were excused from the courtroom, a question was asked by the Attorney General pertaining to whether or not this witness had observed or knew anything about any mistreatment of her sister on some prior occasion or occasions. The Court has sustained the objection by the defendant's counsel to this question as being immaterial and not relevant to the case on trial. You will not consider it for anything. You will not consider the question nor the answer. Put it out of your mind and consider it for nothing. All right. You may continue.

The Tennessee Court of Appeals considered this assignment of error on direct appeal and concluded that the prosecutor's remarks were "overly zealous in support of this incompetent line of proof," but that any resultant error was, given the "context of the undisputed facts of the case ... harmless beyond a reasonable doubt." 521 S.W.2d at 595.

■ The district court's analysis of this issue is confined to a single paragraph in which the court agreed with the state's characterization of

> this episode as "admittedly over zealous in support of the admissibility of evidence" but not so serious to have created substantial prejudice in the minds of the jury to rise to the level of a violation of

the petitioner's constitutional right to a fair trial.

. . . .

Given the trial judge's cautionary instruction to the jury, the event standing alone does not amount to a mistake of constitutional proportion.

We agree, and we address *infra* the district court's conclusion that "this episode does not stand alone" and, when considered with the other asserted grounds for relief, resulted in a fundamentally unfair trial warranting the petitioner's discharge.

### D.

Ground 4: Prosecutor's comment on defendant's failure to testify.

As noted above, the district court declined to discuss this asserted ground for relief, concluding that grounds 1, 2, 3 and 5 required issuance of the writ. Nevertheless, in light of the district court's passing reference to this ground in conjunction with its conclusion that Lundy did not receive a fair trial, we address it as completely as though the district court relied upon it explicitly.

Petitioner claims that the prosecutor commented improperly on his failure to testify in his own behalf by observing that "[t]he only story we heard about what happened from 8:15 on the night of March 16th until about 4:00 in the morning of March 17th came from the State's witnesses." We recently reiterated the standard for reviewing claims of this nature on habeas:

When viewing the constitutionality of indirect references by the prosecutor to the defendant's failure to testify, this court must examine four factors:

1) Were the comments "manifestly intended" to reflect on the accused's silence or of such a character that the jury would "naturally and necessarily" take them as such;

2) were the remarks isolated or extensive;

3) was the evidence of guilt otherwise overwhelming;

4) what curative instructions were given and when.

*Hearn v. Mintzes,* 708 F.2d 1072, 1077 (6th Cir.1983); *accord Spalla v. Foltz,* 788 F.2d 400, 404 (6th Cir.1986). The court will not find manifest intent if some other explanation for the prosecutor's remarks is equally plausible. *United States v. Robinson,* 651 F.2d 1188, 1197 (6th Cir.1981).

*Lent v. Wells,* 861 F.2d 972, 975 (6th Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989).

■ Applying this standard to the remark at issue here, it is apparent that the statement does not rise to the level of a constitutional violation. The "manifest intent" of the remark was plainly not to comment on petitioner's failure to testify, and we are satisfied that given the context of the statement, the jury was unlikely to have "naturally and necessarily" taken them as such. The statement was made in the course of the prosecutor's closing summation in which he was arguing that the jurors should not accept the defendant's theory that the minor inconsistencies in the state's evidence should leave any reasonable doubt as to the defendant's guilt of the crimes charged because the testimony of the state's witnesses was compelling and essentially uncontradicted. In *People of the Territory of Guam v. Ojeda,* 758 F.2d 403, 407 (9th Cir.1985) (citation omitted), the court stated that the prosecutor's comment on the "general lack of testimony supporting defendant's side of the story" is permissible " 'so long as . . . not phrased to call attention to defendant's own failure to testify.' " Further, the remark was isolated, the evidence against petitioner was strong, and the court properly instructed the jury that it could not hold Lundy's failure to testify against him. We hold that the remark did not violate petitioner's privilege against self-incrimination. Because the remark was in no way violative of Lundy's right to a fair trial, it adds nothing to our cumulative analysis, *infra,* of the procedural errors at the trial.

Ground 5: The prosecutor's numerous personal evaluations of the defendant's proofs during closing argument.

The district court has identified ten statements made by the prosecuting attorney during oral argument which the court characterized as

some examples of instances in which the Attorney General continuously testified and added his personal evaluations to the state's proof. The pronoun "I" is scattered throughout the transcript of the closing argument.

The cited instances are the following:

(a) I cannot imagine in my own mind a worse crime being committed, a more personally humiliating crime being committed.

(b) I can't think of a more grave or upsetting crime than the ones we'ves [sic] heard here for the last two days.

(c) The only story we've heard about what happened from 8:15 on the night of March 16th until about 4:00 in the morning of March 17th *came from the State's witnesses*. (Emphasis supplied)

(d) I don't think it's important, but....

(e) Now, *I, like [the Assistant Prosecutor], could not believe the words* I was hearing back when we started this case.... (Emphasis supplied)

(f) Well, I think it's pretty important to her.

(g) I don't think she'll ever forget what she went through that night out there.

(h) ... and the first question I asked that lady when I talked to her was why she got in the car, and she thought they were in the neighborhood, and it was raining, and she wanted to get a ride home. She's about as lazy as I am, I guess.

(i) On the other hand, *if you think as I do*, and I've never wanted to be on a jury more in a case *I've tried*, that this is one of the most despicable crimes *I have ever heard* testimony presented in six years of being in prosecution.... (Emphasis supplied.)

... and I don't mean ten years, and I don't mean twenty years, and I don't even mean ninety-nine years. I mean forever. If you agree with me that it is despicable as I feel it is, I want you to set a term that....

(j) I don't think there's anything unreasonable about a term of years that will make sure he spends the rest of his life in the penitentiary, and that's a term way over the standard fifty or sixty or seventy years for rape.

Describing item (j), the prosecutor's call for a sentence "way over the standard fifty or sixty or seventy years for rape" as "especially troubling," the district court stated that

[T]his continual placing of the weight and prestige of the State and its prosecuting attorney behind the evidence is extremely serious.

Once again, however, the district court declined to hold that the ten cited instances of the prosecutor using the pronoun "I" in his closing argument as a means of personally evaluating the seriousness and weight of the evidence, and his request for a jury sentence "way over the standard" term were, individually or in combination, so egregious as to have denied the defendant a fair trial. Indeed, as we have indicated, the district court stated that it was assuming, without deciding, "that each individual mistake was only harmless error...." It was only in combination with grounds 1, 2, and 3 that "[t]his continual placing of the weight and prestige of the State and its prosecuting attorney behind the evidence" became so overbearing "that the jury was too tainted and influenced to be able to give the petitioner a fair trial."

■ A careful examination of the ten cited instances of the prosecutor's use of the pronoun "I," in various contexts, discloses a pattern of inartful, unpolished, and rather egocentric argument—suggesting, arguably, that the crimes are egregious because the prosecutor thinks they are. But our examination of the argument does not reveal, in our judgment, misconduct rendering the entire trial fundamentally unfair. The prosecutor's summation did not consist of simply the ten isolated instances containing the pronoun "I" expressing the prosecutor's personal opinions about the significance of the evidence and asking for a severe sentence. The entire rebuttal argument covers six pages of trial

transcript. It reviewed the evidence, urged the jury to credit the testimony of the state's witnesses, pointed out that the essential facts of the case are uncontradicted, emphasized the brutal and depraved conduct of the defendant as described not only by the prosecutrix but by defendant's girlfriend who was present throughout the ordeal, and asked for a conviction. The cited instances of asserted improper argument are interspersed throughout the prosecutor's lengthy summation and, in context, are no more than relatively isolated instances of the prosecutor's expression of personal revulsion at the enormity of the crime and his reaction to its appalling details. Many of the ten cited instances are unquestionably examples of improper argument. They did have the tendency to suggest to the jury that the state's evidence is credible and that the crime is despicable, partly because the prosecutor thought they were. This was unprofessional and improper argument by the prosecutor because it risks, in a close case, suggesting to the jury that it should convict and sentence harshly because the State, in the person of the prosecuting attorney, wishes the jury to do so. But this case was not close, the essential facts were not in dispute, and the crime was horrible. It was the evidence that was inflammatory in the case, not the prosecutor's argument. While the prosecutor's repeated references to his personal opinion were improper, it must be kept in mind that the trial, including the shocking details of the defendant's conduct as described by the State's witnesses, was an essentially uncontradicted narrative of a brutal and sadistic attack upon a young lady who had been forcibly confined and restrained by the defendant, and repeatedly struck and threatened with bodily harm if she did not continue to submit to his commands.

We are satisfied that, after hearing the evidence that was adduced, the jury was not likely to have been very much impressed by the prosecutor's statement in argument that the crime was despicable and the state's witnesses credible, or that a sentence "way over the standard fifty, sixty or seventy years" was appropriate. We

note that defendant's counsel registered no objection to any part of the argument either during or after its presentation, except to protest the reference to a "standard" rape sentence. The trial court immediately sustained that objection and instructed the jury that there was no "standard" sentence for rape and that "[e]ach case stands in accordance with the charge that is given to you and the evidence that has been presented to you." This instruction cured any misapprehension the jury may have had as to its sentencing discretion.

No case has been cited to us, nor have we been able to find one, in which even remotely comparable closing argument, although improper for the reasons we have indicated, has been held to be so egregious as to deny a fair trial within the meaning of the due process clause. We harken back to the district court's conclusion, with which we agree, that this assignment of error, standing alone, was not grounds for issuing the writ.

F.

Ground 6: Trial court's instruction that every witness is presumed to tell the truth.

■ As with ground 4, the district court did not discuss this assignment of error. Nevertheless, the court apparently did consider it as a component of the "bundle [of straws] which served to crush the petitioner's right to a fair trial," and so we take it up here. Petitioner argues that his right to a fundamentally fair trial was impaired by the trial court's instruction that "every witness is presumed to swear the truth." We must reject petitioner's contention because the Supreme Court has already repudiated a constitutional challenge to this instruction. *Cupp v. Naughten*, 414 U.S. 141, 147–50, 94 S.Ct. 396, 400–02, 38 L.Ed.2d 368 (1973). In *Cupp*, the Court held that as long as the jury is correctly instructed that a defendant may not be convicted except upon proof beyond a reasonable doubt and that a defendant enjoys a presumption of innocence, "[w]hatever tangential undercutting of these clearly stated propositions

may, as a theoretical matter, have resulted from the giving of the instruction on the presumption of truthfulness is not of constitutional dimension." *Id.* at 149, 94 S.Ct. at 401. Because the jury in the case at bar was properly instructed on the presumption of innocence and the State's duty to prove guilt beyond a reasonable doubt, we conclude that the instruction that witnesses are presumed to be truthful did not violate petitioner's rights under the due process clause. Thus, this asserted ground for relief, like grounds 2 and 4, in no way burdened Lundy's right to a fundamentally fair trial; hence, it may not be considered as a "straw of the bundle" of errors under consideration in this case.

## V.

We turn now to the district court's finding that the issues discussed in part IV, *supra,* did not, when considered individually, deny due process but, when considered together, leave "no doubt but that the jury was too tainted and influenced to be able to give the petitioner a fair trial." We note at the outset that only grounds 1, 3, and 5 charge procedural errors which we have found may have been arguably prejudicial to petitioner's right to a fundamentally fair trial. Consequently, grounds 2, 4, and 6 do not enter into our analysis of whether the cumulative effect of the procedural errors destroyed petitioner's right to due process. We conclude that the prejudicial effect of the errors set forth in grounds 1, 3, and 5 of the habeas petition, when considered cumulatively, did not deprive Lundy of the fundamentally fair trial granted him under the fourteenth amendment.

The district court's finding that the whole, in this instance, is greater than the sum of the parts, is simply unsubstantiated. The district court made a conscientious assessment of the effect of the accumulated errors at trial, but its conclusion that the cumulative errors it found denied the defendant a fair trial is wholly unsupported by citation to precedential authority or convincing argument. The judgment issuing the writ is a reflection of the district court's feeling about the matter, shaped largely, we suspect, by the heavy but lawful sentence imposed by the jury.

However, our *de novo* assessment of legal effect, indeed the constitutional significance of the trial errors considered cumulatively, leads us to the confident conclusion that the defendant's trial was procedurally imperfect but by no means fundamentally unfair. The asserted grounds for relief, considered individually or together, describe "mistakes," as the district court characterized them, that pale into relative insignificance given the overwhelming uncontradicted evidence of the defendant's guilt of crimes. The disgusting details of these crimes completely justified the jury's verdict and sentence.

We hold that the district court erred in concluding that errors complained of denied the defendant due process of law. Its judgment granting a writ of habeas corpus is therefore REVERSED, and the petition is dismissed.