**Sandra Baker WATERS,**
**Petitioner–Appellant,**

v.

**Betty KASSULKE, Warden, Kentucky**
**Correctional Institution For Women,**
**Respondent–Appellee.**

No. 89–5974.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 2, 1990.

Decided Oct. 4, 1990.

Marguerite Neill Thomas (argued), Dept. of Public Advocacy, Frankfort, Ky., for petitioner-appellant.

Denise A. Garrison (argued), Asst. Atty. Gen., Frankfort, Ky. (Frederick J. Cowan, Atty. Gen., Frankfort, Ky., on the brief), for respondent-appellee.

Before KENNEDY, BOGGS and TIMBERS,* Circuit Judges.

TIMBERS, Circuit Judge:

Appellant Sandra Baker Waters, a state prisoner, appeals from an order entered June 30, 1989, in the Western District of Kentucky, Thomas A. Ballantine, Jr., *District Judge*, granting in part, and denying in part, her petition under 28 U.S.C. § 2254 (1988) for a writ of habeas corpus.

Appellant was convicted on eight counts of complicity in the rapes of her three minor daughters by her boyfriend, Merton "Doc" Bond, pursuant to Ky.Rev.Stat. § 502.020 (1985). The Supreme Court of Kentucky affirmed appellant's conviction on April 10, 1986. Her state remedies have been exhausted.

On December 28, 1988, appellant filed the instant petition for a writ of habeas

* Of the Second Circuit, sitting by designation.

corpus in the United States District Court for the Western District of Kentucky contending that: (1) the evidence was insufficient to support the verdicts; (2) the testimony of a pediatrician invaded the province of the jury; and (3) the introduction of evidence of prior bad acts denied her due process of law. The district court vacated the convictions on counts one and seven of the indictment, ruling that the evidence was insufficient to support those verdicts, but denied the petition as to the remaining six counts. On appeal, appellant renews her claims as to counts two through six and eight.

For the reasons that follow, we affirm the judgment of the district court.

## I.

We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues on appeal.

Appellant was indicted by a grand jury sitting in Nelson County, Kentucky. The indictment was returned February 28, 1983. It charged her with seven counts of complicity in the first degree rapes of her daughters P.W., age 12; D.W., age 10; and R.W., age 8, by her boyfriend Bond, between February 13, 1983 and February 25, 1983. She also was charged with one count of complicity in the second degree rape of P.W.. Bond has been tried and convicted separately.

The indictment originally charged that appellant had a duty to prevent the rapes of her daughters and failed to do so. Prior to trial, appellant moved that the Commonwealth elect between the theory charged in the indictment and a theory based on aiding, abetting and counseling that the Commonwealth mentioned during jury selection. The Commonwealth moved to amend the indictment to charge appellant with aiding, abetting and counseling Bond in the rapes of her daughters. The trial court allowed that amendment and restricted the Commonwealth's proof to that theory.

Appellant and her three daughters lived with Bond for most of the five year period preceding the events set forth in the indictment. Bond was not the girls' natural father. Throughout this period, the family subsisted on appellant's welfare benefits and Bond's social security disability benefits. The family was nomadic. After the girls were removed from a foster home in New York, they traveled with appellant and Bond to Hillsdale, Michigan; Altmire, New York; Sandy Creek, New York; Clarksburg, West Virginia; Lone Oak, Arkansas; New Haven, Kentucky; Mexico, New York; and Clarksburg, West Virginia; before returning to New Haven, Kentucky, where the events involved in this case took place.

Appellant's three daughters testified at her trial. We shall summarize their testimony.

P.W. testified that she was eight years old when Bond first had sexual intercourse with her, while they were living in Michigan. Appellant was present on that occasion and told P.W. to calm down when she started crying. Appellant told P.W. not to tell the social workers or her teachers what had happened. P.W. also was sexually abused by a baby sitter in Michigan.

P.W. testified further that Bond continued to have sexual intercourse with her in the ensuing years. Appellant was present on one occasion when Bond threatened to kill P.W. if she did not submit to him. On other occasions, appellant warned P.W. that, if she told anyone about Bond's abuse, she would have to go back to a foster home. Appellant also told P.W. that she loved Bond and would not leave him. P.W. testified that, when they lived in West Virginia, appellant would bring one of her daughters to Bond's bedroom when he desired to have sexual intercourse.

D.W. testified that at the age of eight, Bond "hurt" her when the family lived in New York. D.W. also testified that Bond "hurt" her in West Virginia. She contemplated running away from home while living in West Virginia.

R.W. testified that Bond first "hurt" her in New York when she was five years old. R.W. also testified that appellant was present on some of the occasions when Bond "hurt" her.

On February 12, 1983, Bond, appellant, her three daughters, and the family dog arrived in New Haven, Kentucky. They were living in a camper, parked beside a playground.

On February 13, appellant went grocery shopping, taking D.W. and R.W. with her, and leaving P.W. in the camper with Bond. Bond had sexual intercourse with P.W.. On February 16, P.W. visited a friend's home after school. The others (appellant, Bond, D.W. and R.W.) drove in the camper to a rural area of Nelson County and parked near a roadside park. Appellant took the dog and left the camper. Bond instructed R.W. to remove her clothes. Bond "hurt" R.W. while D.W. watched. When R.W. finished dressing, appellant was waiting outside the camper. Bond instructed appellant to take R.W. and the dog where she had been before. Appellant did so, leaving D.W. in the camper with Bond. Bond proceeded to "hurt" D.W.

The next day, February 17, they returned to the same area. This time, the three girls were present. Bond instructed appellant, P.W. and D.W. to walk the dog. They walked to a location near the river about one half mile from where the camper was parked. R.W. remained in the camper with Bond. After supper, appellant, D.W. and R.W. took the dog for a walk. Bond had sexual intercourse with P.W., who had been left behind in the camper.

P.W. ran away from "home" on February 22. She stayed at a friend's home the next two nights. On February 24, P.W. was taken in by a woman who saw her on the road. P.W. told this woman that she was 15 years old. She stayed at this woman's home for the next two nights.

D.W. testified that in the meantime Bond "hurt" her on February 25, and on one other occasion after P.W. ran away. Appellant was present in the camper on both occasions. On one of these occasions, Bond threatened to gag D.W. if she screamed. On another occasion, D.W. told her mother that she hated what Bond was doing to her. Appellant replied, "I don't care." R.W. testified that Bond "hurt" her again after P.W. ran away, but did not remember if he "hurt" her more than once. D.W. and R.W. both testified that appellant knew what was taking place in the camper. P.W. testified that she did not think appellant knew what was going on in the camper.

On February 26, the woman P.W. was staying with found out her true age. The woman told P.W. that she would have to take her home. P.W. began to cry and told the woman what was taking place in the camper. The woman took P.W. to the police station, where she tape recorded a statement for the police. Bond and appellant were arrested later that night.

The girls were interviewed by a police officer and a social worker, and were examined by a pediatrician. These three people testified at appellant's trial. The social worker, Jane Shams, testified that the three girls told her they had been sexually abused by Bond. She testified further that their behavior was consistent with a family situation where one or more small children are being sexually abused. The police officer, Roger Gagne, testified to events concerning the investigation leading to appellant's arrest. The social worker and the police officer both identified the area the camper had been driven to on February 16 and February 17 from the descriptions the girls had given of the area.

The pediatrician, Dr. James Hedrick, testified that, based on his physical and oral examinations of the girls, he believed they had been the victims of sexual abuse. He also testified that the girls' behavior was consistent with that of sexually abused children, and that their detailed sexual knowledge was greater than one would expect of girls their ages. He further testified that "I assume [R.W.] was telling the truth as far as who she said did it."

Appellant testified on her own behalf. She said that she was not aware of Bond sexually abusing her daughters, but that she believed they were sexually abused while in foster care. She further testified that she had a hostile relationship with P.W., who developed drug, alcohol and truancy problems in October 1982, while the family was living in West Virginia.

Appellant speculated that the girls' allegations were the result of a plot hatched by P.W., and consented to by D.W. and R.W., who were intimidated by P.W. and wanted to live with their natural father. According to the defense, this plan was concocted some time prior to P.W. running away, when the three sisters took a walk together and discussed an episode of "Different Strokes" they had seen on television which dealt with child molestation. P.W. and R.W. confirmed that they discussed the program. D.W. denied having participated in such a discussion.

A jury convicted appellant on all eight counts. She was sentenced to seven life terms on the seven convictions for complicity in first degree rape, and ten years on the conviction for complicity in second degree rape. The sentences were to run concurrently. Appellant's conviction was affirmed by the Supreme Court of Kentucky.

Appellant sought a writ of habeas corpus in the United States District Court for the Western District of Kentucky. The district court granted the petition as to counts one and seven, which charged appellant with complicity in the first degree rapes of R.W. on February 23 and February 17, respectively. The court found the evidence insufficient to convict on those counts since R.W. testified that she could not remember if Bond "hurt" her on those days. The court also found that it was error to admit Dr. Hedrick's testimony concerning the credibility of the girls, but held that the error did not rise to the level of a constitutional violation. The court denied the petition as to counts two through six and eight.

This appeal followed.

## II.

We turn first to appellant's contention that the evidence was insufficient to support the verdicts. A federal court will grant habeas relief on this claim only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). In applying this standard, we review the evidence "in the light most favorable to the prosecution." *Id.*

## (A)

■ Appellant contends that the Commonwealth did not change its evidence to conform with the new theory it adopted on the eve of trial. Appellant argues that, at worst, the evidence showed no more than that appellant failed to prevent the rapes of her daughters by Bond. This is not criminal under Kentucky law. *Knox v. Commonwealth*, 735 S.W.2d 711 (Ky.1987). We disagree with appellant's characterization of the evidence presented at trial.

As amended, the indictment charged appellant with complicity pursuant to Ky.Rev. Stat. § 502.020(1)(b) (1985). That statute reads:

"(1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, [s]he: ... (b) Aids, counsels, or attempts to aid such other person in planning or committing the offense."

■ Under this statute, mere knowledge that a crime is going to be committed, absent a legal duty to prevent it, is not enough to support a conviction. *Dowdle v. Commonwealth*, 554 S.W.2d 92, 94 (Ky. App.1977). To support a conviction, the Commonwealth must prove that appellant "intend[ed] to participate in the promotion, facilitation, or commission of the offense." *Id.; see also United States v. Elkins*, 732 F.2d 1280, 1287 (6th Cir.1984) ("[t]o be found guilty of aiding and abetting a criminal venture, the defendant must be proved beyond reasonable doubt to have associated herself with it, and to have participated in it as in something she wished to bring about; and to have sought by her actions to make it succeed"). The Commonwealth has met that burden.

■ As an initial matter, to convict appellant of complicity, the Commonwealth must prove that the principal crime occurred. *Sams v. Commonwealth*, 171 S.W.2d 989, 993 (Ky.1943). With the exception of the counts alleging rapes of R.W. on

February 17 and February 23, the convictions on which were vacated by the district court, there was sufficient evidence on the remaining counts for the jury to base a finding that the girls had been raped by Bond. This evidence consisted of the girls' testimony, which was corroborated by the social worker and the pediatrician, who both testified that they believed the girls had been the victims of sexual abuse. The only contradictory testimony came from appellant. Although the jury was entitled to adopt her version of events, "it was not required to do so." *Simpson v. Commonwealth*, 759 S.W.2d 224, 226 (Ky.1988); *accord Mishler v. Commonwealth*, 556 S.W.2d 676, 681 (Ky.1977) ("jury was not compelled to believe [defendant's] story").

■ We cannot accept appellant's assertion that proof of intent was lacking. To require direct evidence of intent would place an unreasonable burden on the Commonwealth. The only person who can truly supply such evidence generally is the defendant herself. Consequently, a jury is given a wide latitude to infer intent from the surrounding facts and circumstances. *Simpson, supra,* 759 S.W.2d at 226; *Rayburn v. Commonwealth,* 476 S.W.2d 187, 189 (Ky.1972).

There was sufficient evidence from which the jury could infer that appellant intended to promote or facilitate the rapes of her daughters. Appellant's intent could be inferred from her conduct and her statements to her daughters, including evidence of appellant bringing the desired daughter to Bond for sex; appellant encouraging her daughters not to reveal the abuse, thus ensuring that it could continue; appellant telling her daughters that Bond's conduct toward them was a natural happening between a man and a woman; and appellant's responses to their protests, which had the effect of discouraging resistance.

Appellant contends that the Commonwealth's mixed bag theory was insufficient to prove that she aided and assisted Bond in the rapes of her daughters. We disagree.

Appellant asserts that in some of the charged instances she was present, in others she was not. On one occasion two daughters were with Bond, on the other occasions only one. Appellant was not charged with leaving her daughters alone with Bond, nor was she charged with standing idly by while Bond abused them. Rather, she was charged with aiding and abetting Bond's abuse of them. The Commonwealth was not required to prove only one method of assistance. A rational jury could find that the fact that appellant's conduct differed showed only that her assistance varied according to the circumstances.

Furthermore, a rational jury could find that appellant assisted Bond by ensuring that only the particular daughter(s) he desired were available to him, thereby providing Bond with the opportunity to rape them. Also, a rational jury could find that appellant assisted Bond through her statements to and conduct towards her daughters, which encouraged them to submit to Bond, created an atmosphere in which it was clear that protest and resistance would be futile, and ensured that Bond's conduct would not be revealed. Under the circumstances, appellant's statements and conduct were the equivalent of holding the girls down or blocking the exits while Bond raped them.

We hold that there was sufficient evidence upon which a rational jury could find appellant guilty beyond a reasonable doubt of complicity in the rapes of her minor daughters.

(B)

■ Appellant also attacks the jury instructions, which she claims misstated the law of accomplice liability and allowed the jury to convict on insufficient evidence. We find no merit in this claim.

The trial court instructed the jury that in order to convict they must find beyond a reasonable doubt "[t]hat the Defendant aided and assisted Merton Bond by (1) encouraging [her daughters] to participate in sexual intercourse with Merton Bond OR (2) by providing Merton Bond with the opportunity to participate in sexual intercourse

with [her daughters]." Appellant points out that the term "counsels" in the statute refers to counseling the perpetrator, not the victim.

We believe that the trial court's instructions, read properly, allowed the jury to convict appellant not merely for counseling her daughters, but only if they found that her counseling aided and assisted Bond's criminal conduct. We find nothing wrong with this instruction.

We hold that the jury instructions did not invite the jury to convict on insufficient evidence.

### III.

We turn next to appellant's contention that the testimony of Dr. Hedrick invaded the province of the jury and denied her due process. We agree with the district court's conclusion that any error made with regard to Dr. Hedrick's testimony did not rise to the level of a constitutional violation.

Our review of state court evidentiary rulings is extremely limited. "[E]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988); *see also Lundy v. Campbell*, 888 F.2d 467, 469–70 (6th Cir. 1989) (deference should be accorded state court determinations of whether due process was denied by trial errors), *cert. denied*, 110 S.Ct. 2212 (1990). Such errors will result in the granting of a writ of habeas corpus only if they result "in the denial of fundamental fairness, thereby violating due process." *Cooper, supra*, 837 F.2d at 286.

Dr. Hedrick was qualified by virtue of his training as a pediatrician (which included training in uncovering and diagnosing sexual abuse) to testify that, based on his oral and physical examinations of the girls, in his opinion they were victims of sexual abuse. *Pevlor v. Commonwealth*, 638 S.W.2d 272, 275–76 (Ky.1982), *cert. denied*, 459 U.S. 1149 (1983).

We agree with the district court's conclusion that it was error to admit Dr. Hedrick's testimony concerning the credibility of the girls. Dr. Hedrick testified, over appellant's objection, that "I assume [R.W.] was telling the truth as far as who she said did it." Under Kentucky law, expert testimony that purports to resolve an ultimate jury issue is inadmissible. *Hester v. Commonwealth*, 734 S.W.2d 457, 459 (Ky.), *cert. denied*, 484 U.S. 989 (1987). The identity of the rapist, if any, and the credibility of the girls were ultimate issues for the jury to decide. This testimony should not have been admitted or should have been stricken since it invaded the province of the jury.

We do not believe, however, that this error rendered the trial fundamentally unfair. In making this determination, such errors are to be considered "within the context of the entire record." *Payne v. Janasz*, 711 F.2d 1305, 1310 (6th Cir.), *cert. denied*, 464 U.S. 1019 (1983).

> "The 'entire record' refers to all that occurred from the empanelment of the jury to the return of the verdict and includes, *inter alia*, the quality and quantity of the evidence of the defendant's guilt; the extent to which the substantive evidence of guilt produced by the prosecution was consistent or inconsistent, contradicted or uncontradicted, weak or forceful, and clear or vague; the manner in which the evidence was presented; the apparent independence, interest, or bias of the witnesses; the candor, clarity, and completeness of their testimony, including whether it was impeached; and everything the jury saw and heard, including the many objections, legal arguments, and evidentiary rulings that occurred in the jury's presence, as well as the court's instructions to the jury."

*Lundy, supra*, 888 F.2d at 472–73.

There was substantial evidence, absent Dr. Hedrick's statement, to establish the fact that Bond raped the girls.

The three girls testified to this fact. Each daughter corroborated the others' testimony. Moreover, they consistently

stated the fact that Bond had raped them in conversations with the social worker, the police, the pediatrician, and in their testimony at trial. Appellant was the only witness who contradicted this testimony.

We hold that this error, viewed in the context of the entire record, did not render the trial fundamentally unfair.

## IV.

This brings us to appellant's claim that the admission of evidence of prior bad acts denied her due process. She claims that evidence of Bond's sexual abuse of the girls outside Kentucky was inadmissible. In the alternative, she claims that, even if such evidence was admissible, it was not admissible as testimony by the victims themselves. We find these claims to be without merit.

### (A)

■ Evidence of prior bad acts is not admissible to prove propensity to commit the charged crime. *Moore v. Commonwealth*, 771 S.W.2d 34, 39 (Ky.1988), *cert. denied*, 110 S.Ct. 1536 (1990); *Adcock v. Commonwealth*, 702 S.W.2d 440, 443 (Ky. 1986); *O'Bryan v. Commonwealth*, 634 S.W.2d 153, 156 (Ky.1982). Such evidence, however,

"is admissible if, (1) it is offered to prove motive, intent, knowledge, identity, plan or scheme, or absence of mistake or accident; (2) such evidence is relevant to the issues other than proof of a general criminal disposition, and (3) the possibility of prejudice to the accused is outweighed by the probative worth and need for the evidence."

*O'Bryan, supra*, 634 S.W.2d at 156; *see also Moore, supra*, 771 S.W.2d at 39; *Pendleton v. Commonwealth*, 685 S.W.2d 549, 552 (Ky.1985).

■ Applying this standard, we hold that the evidence was admissible to prove knowledge and intent. Appellant testified that she was unaware of Bond's abuse of her daughters. She cannot insist that the Commonwealth refrain from rebutting that defense. Appellant testified on cross-examination that, if such abuse were occur-ring on a regular basis, she would have known about it. Viewed in light of this testimony, the prior bad act evidence clearly was probative on the question of the credibility of appellant's denial of knowledge.

Moreover, this evidence was relevant to prove appellant's intent. Much of this evidence dealt with appellant's conduct and statements concerning Bond's previous sexual abuse of her children. For instance, there was evidence that appellant brought her daughters to Bond's bed in West Virginia when he desired to have sexual intercourse with them. Also, appellant's statements to the girls had the effect of encouraging secrecy and discouraging resistance. The effect of appellant's prior conduct and statements carried over and assisted Bond in the rapes that were the subject of the indictment.

■ Furthermore, the probative value of this evidence outweighed its prejudicial effect. "Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). The evidence here in question was crucial to the Commonwealth's case. It was necessary to prove appellant's knowledge of what was going on in the camper and her intention to facilitate or promote that criminal conduct.

We hold that it was not error to admit evidence of Bond's sexual abuse of the girls, and appellant's conduct relative to that abuse prior to their arrival in Kentucky.

### (B)

■ Appellant asserts that, even if evidence of Bond's previous sexual abuse was admissible, it was not admissible as testimony from the victims. She contends that this, in essence, allowed the girls to corroborate their own testimony and bolster their own credibility. We find no merit in this contention since this testimony was proper-

ly admitted as evidence of appellant's knowledge and intent, and not admitted to bolster the testimony that the rapes in Kentucky had taken place.

We hold that it was not error to allow the girls to testify about their prior sexual abuse by Bond.

## V.

To summarize:

We hold that the evidence was sufficient to support the jury's guilty verdicts as to appellant's complicity in the first degree rapes of her daughters and her complicity in the second degree rape of one daughter, as charged in counts two through six and eight of the indictment. We also hold that an error made in admitting a pediatrician's testimony concerning the victims' credibility did not rise to the level of a due process violation. Finally, we hold that evidence of prior sexual abuse of the victims was properly admitted.

Affirmed.