**Robert Allen WILLIAMS, Jr., Petitioner–Appellee,**

v.

**Pamela WITHROW, Respondent–Appellant.**

No. 90–2289.

United States Court of Appeals, Sixth Circuit.

Argued May 16, 1991.

Decided Sept. 11, 1991.

Daniel P. O'Neil, Traverse City, Mich. (argued and briefed), for petitioner-appellee.

Robert Allen Williams, pro se.

Timothy A. Baughman, John D. O'Hair, Pros. Atty., Jeffrey W. Caminsky (argued and briefed), Detroit, Mich., Becky M. Lamiman, Asst. Atty. Gen., Suzanne L. Wilhelm, Office of Atty. Gen., Habeas Div., Lansing, Mich., for respondent-appellant.

Before JONES and RYAN, Circuit Judges, and PECK, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

Appellant Pamela Withrow, the warden of the Michigan Reformatory, appeals from an order of the district court granting the habeas corpus petition of Robert Allen Williams, Jr. As we discern no error in the

district court's grant of Williams' habeas corpus petition, we affirm.

## I

On April 6, 1985, police officers in Romulus, Michigan discovered two males shot to death in a parked car. Responding to a rumor, Detective Sgt. David Early of the Romulus Police Department went to Williams' house to question him on April 10, 1985. At the house, Williams was searched but not handcuffed, and was asked to accompany Sgt. Early to the police station. When Williams arrived at the police station, he was questioned by Sgt. Early and his partner, Sgt. Ondejko. Williams was not given *Miranda* warnings before this first round of questioning. After Williams denied having any information about the murders, Early told Williams that "the main thing on this is we want the shooter. We're not real interested in who was there or who was along for the ride or anything else. We get the shooter on this and we're gonna pretty well be content." Williams continued to deny being present at the scene, prompting Early to state:

> You know everything that went down. You just don't want to talk about it. What it's gonna amount to is you can talk about it now and give us the truth and we're gonna check it out and see if it fits or else we're simply gonna charge you and lock you up and you can just tell it to a defense attorney and let him try and prove differently. We're not playing. We've been chasing around on this too fuckin' long.

Sgt. Early then gave Williams the choice of answering his questions or being formally charged. Sgt. Early also told Williams that he had "big problems", that the police were close to issuing an arrest warrant for him, and that the police knew of witnesses who would testify against Williams. At this point, Williams admitted that he had provided the murder weapon because he wanted to sell the gun, and that the murderer had called him after the crime and told him he had discarded the gun and his clothes in the river. Questioning continued, with the police again insisting that they were only interested in finding the shooter. Williams again denied being present at the scene of the crime. Sgt. Early later testified that the April 10 interrogation proceeded for "approximately 35 to 40 minutes" before Williams was read his *Miranda* rights. Williams was questioned a second time on April 10, 1985, and again on April 12. *Miranda* warnings were given prior to the second session on April 10, and before the April 12 session, and Williams indicated his understanding of his rights.

At the second interrogation on April 10, the following exchange took place between Williams, Sgt. Early, and Sgt. Ondejko:

Ondejko: Do you wish to change your story?

Williams: What difference is it going to make?

Ondejko: It's gonna make a lot of difference to you.

Early: I told you. If you told the truth . . .

Williams: I've been telling you the truth.

Early: Oh, you've been making up fairy tales ever since you've been in here. You're giving us, like he says, parts of the truth, parts of what you want us to believe, and part of what really happened.

Williams: If I tell you everything that happened, I'm gonna walk outta here, huh?

Ondejko: Someday you may stand a chance of walking.

Early: I'll make you a deal. You tell us everything that happened and you tell us the truth and I confirm it on a polygraph that you're telling us the truth. Yeah, you walk.

Following this exchange, Williams admitted driving Mark Sennett, identified as the shooter, to the scene of the murders following behind the victims' car. He also admitted that he turned his car around at the request of Sennett, that he heard shots and muzzle flashes, and that he drove Sennett away from the scene and helped dispose of Sennett's clothing and the murder weapon. Williams denied knowing that Sennett was going to kill the two victims.

Officer Early then elaborated on the deal with Williams:

Early: You're worried now about us turning this around on you and charging you too. We've said that basically we want you as a witness. Right?

Williams: Yes.

Early: Alright, I'm gonna tell you right now, at the start of the recording, if we use this recording against you, it's got to be in its entirety. We can't edit it or cut it. We told you if you are a witness to this and if you are telling the truth, and if you are willing to testify, then we are not going to charge you as a co-defendant. That's what we told you, right?

Williams: Yes.

Early: Alright. We're still gonna go by that agreement. And I don't. [Abrupt stop.] You've been around, but if, whether you're up on the law, if a police officer makes an agreement like that it's got to be honored. You can go to court and say we made that agreement and we backed down on it and we can't present these tapes and use anything else we've got. So it's an agreement we have to stick to by law. I can't promise you anything and then turn around and back out of it and use it against you.

Williams: O.K.

Early: Right now you're a witness to the crime. But we want the truth. If you start lying to us and you start playing games, yeah, we're gonna charge you. A witness doesn't do us any good unless he tells the truth. We're not trying to hang anybody with any made up testimony or anything but the truth. After you're done with this, we still gonna put you on a polygraph and you're gonna have to show us you're telling the truth. So that's the deal. You're telling the truth and you're not being charged. That fair enough?

Williams: Yeah.

On October 29, 1985, Williams was convicted of two counts of first-degree murder and two counts of felony firearm charges in the Circuit Court of Wayne County. The state trial court excluded the statements from April 11 and 12 as "improperly ob-tained" under Michigan caselaw because the delay in actually arresting Williams was "used as a tool to extract the statements". On September 7, 1988, the Court of Appeals of Michigan affirmed Williams' conviction. *People v. Williams*, 171 Mich. App. 234, 429 N.W.2d 649 (1989). The Michigan Supreme Court denied leave to appeal, and the U.S. Supreme Court denied certiorari. 493 U.S. 956, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989). On January 31, 1990, Williams filed a petition for a writ of habeas corpus in the U.S. District Court for the Eastern District of Michigan.

The district court first found that Williams was in custody as of the moment on April 10 when Sgt. Early gave him a choice between answering questions or being charged. As a result, Williams should have been given his *Miranda* warnings at that point. Instead, however, the police continued their questioning without giving *Miranda* warnings, and Williams made inculpatory statements. Williams made further inculpatory statements after *Miranda* warnings were finally given some forty minutes into the interrogation.

The district court evaluated the admissibility of these post-*Miranda* statements under *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). *Elstad* held that there is no presumption of coercion when a suspect makes incriminating statements following earlier, unwarned statements. In that situation, "the relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Elstad*, 470 U.S. at 318, 105 S.Ct. at 1297.

Focusing on whether Williams' admissions were induced by a promise of leniency, the district court concluded that:

In the context of this uncounseled interrogation, following a session where police had obtained unwarned admissions and repeatedly suggested that they were only interested in finding out who the actual shooter was, this Court finds that

the statement that petitioner would "walk" if he told the truth constituted a promise of leniency sufficient to overcome petitioner's will and render his admissions involuntary. As Justice White indicated in *Brady [v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)], "[i]n such circumstances, even a mild promise of leniency [may be] sufficient to bar the confession, not because the promise was an illegal act as such, but because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess." *Brady, supra*, at 754, 90 S.Ct. at 1472.

The district court declared that Williams' inculpatory statements on April 10 obtained after the *Miranda* warnings were given violated the dictates of *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) because of the coercion. *See also Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897) (to be admissible, a confession must be "free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.").

The district court also considered the statements under harmless error analysis. *United States v. Wolf*, 879 F.2d 1320, 1323 (6th Cir.1989) ("Appellate courts, including our own, have applied the harmless error analysis to [otherwise voluntary] confessions admitted in violation of the related rules of *Edwards [v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)] and *Miranda [v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)]."). The district court found that sufficient evidence to convict independent of the confession did not exist; therefore, admission of the confession was not harmless error.

On October 29, 1990, the district court granted Williams' petition for a writ of habeas corpus and gave Michigan ninety days to "take steps to provide" Williams with a new trial. This appeal followed.

## II

This court renders *de novo* review of a habeas corpus proceeding in the district court to determine whether the petitioner received a fundamentally fair trial. *See Lundy v. Campbell*, 888 F.2d 467, 469–70 (6th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2212, 109 L.Ed.2d 538 (1990). However, this court must give complete deference to the state court's findings of fact, and render clearly erroneous review to the district court's factual findings. *Id.*

The principal issue in this appeal is whether the record discloses a fifth amendment violation sufficient to warrant habeas relief.[1] Withrow argues that there was no violation of Williams' fifth amendment rights because Williams was not in custody until he made an incriminating statement, at which point he was *Miranda*ized. This argument is supported by the state trial court and the Michigan Court of Appeals, which both found that Williams "was not in custody until he was read his rights." *Williams*, 429 N.W.2d at 651. Thus, contends Withrow, because the federal habeas statute "requires the federal courts to show a high measure of deference to the factfindings made by the state courts", *Sumner v. Mata*, 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam), the district court exceeded its mandate by not explaining in sufficient detail why "the record in the State court proceeding, considered as a whole, does not fairly support such factual determination." 28 U.S.C. § 2254(d) (1988).

The district court did recognize its obligation to defer to the state court's factual findings. With respect to the crucial "in custody" determination, however, the district court recognized that "the overall question of whether petitioner was in custody is a mixed question of fact and law which requires an independent federal de-

---

1. The government's brief argued that the federal grounds for relief were never fairly presented to the state court for review. At oral argument, the government conceded that this position was without merit.

termination." Even if custody is a factual determination entitled to a presumption of correctness, however, the district court found that "this particular state court finding is so completely devoid of support in the record that the presumption is overcome."

We find that the district court correctly decided that Williams was "in custody" when Sgt. Early told him "you can talk about it now and give us the truth and we're gonna check it out and see if it fits *or else we're simply gonna charge you and lock you up* [.]" (Emphasis added.) Two police officers came to Williams' house, searched him, put him in an unmarked police car, and transported him the police station. The officers repeatedly conveyed to Williams the seriousness of his situation, and threatened him with arrest. Williams was given the choice of cooperating with the police or going to jail. The district judge, who listened to an audio tape of the interrogation, found the officers' tone to be "severe and accusatory." Clearly, a reasonable person would not feel free to leave; therefore, Williams was in custody. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966) ("[C]ustodial interrogation ... [is] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.").

■ Williams' inculpatory statements after he was given *Miranda* warnings could be admissible, even though the statements followed on the heels of unwarned statements, if the statements are determined to be uncoerced and voluntary. *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 1293, 84 L.Ed.2d 222 (1985). " '[T]he ultimate issue of "voluntariness" is a legal question requiring independent federal determination.' " *Arizona v. Fulminante,* — U.S. ——, 111 S.Ct. 1246, 1252, 113 L.Ed.2d 302 (1991) (citations omitted). Withrow contends that the district court incorrectly concluded that Williams' statements were involuntary under *Oregon v. Elstad* because there was no overreaching or coercion by the police. The police mere-

ly offered Williams a conditional incentive to tell the truth, and the fact that Williams did not fulfill his part of the bargain by telling the truth should not lead to the suppression of his statement. The police, asserts Withrow, intended to live up to their part of the bargain. Officer Early testified that "I told Mr. Williams that if he was a witness, and he had no active part in the crime, and that could be confirmed by polygraph, that he would not be charged."

■ The district court relied on the "the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Elstad,* 470 U.S. at 318, 105 S.Ct. at 1298. We believe that an evaluation of "the entire course of police conduct" in this case establishes that Williams' statements were not voluntary. His statements were conditioned on his belief that he would be released if he talked. The officers' promises of leniency were intended to induce Williams' admissions.

We recognize that the success of a criminal investigation often hinges on obtaining information from uncooperative individuals. Indeed, many otherwise unobtainable convictions are secured through extending immunity in exchange for a defendant's testimony against more culpable co-defendants. The necessity of foregoing the prosecution of an informant in order to convict the ringleaders is an altogether different situation from the deliberate inducement of inculpatory statements through illusory promises of leniency. Even in situations where immunity is not envisaged, we have no doubt that effective interrogation techniques require, to some extent, a carrot-and-stick approach to eliciting information from an uncooperative suspect. However, when promises of leniency, coupled with threats of immediate imprisonment, have a coercive effect on a suspect, we are obliged to inquire whether "the 'coercion' in question was sufficient to overbear the will of the accused." *McCall v. Dutton,* 863 F.2d 454, 459 (6th Cir.), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989) (three factors of voluntariness test are (1) objectively coercive police activi-

ty which (2) was sufficient to overbear the will of the accused, and (3) petitioner's will was overborne as a result of the coercion). We find that, under the totality of the circumstances of this case, Williams' statements during the April 10 interrogation were coerced in violation of the fifth amendment and should therefore be suppressed.

### III

The district court granted the writ of habeas corpus based on its conclusion that the incriminating statements on April 10–12 should be excluded as involuntary. However, the state trial court had already excluded the statements made on April 11 and 12 in September 1985, one month before Williams' bench trial. The trial judge based the exclusion on Michigan law:

> Defendant was lodged in jail, and was questioned twice more in addition to undergoing a polygraph examination before he was arraigned on the afternoon of April 12. Statements obtained during an unnecessary delay in arraignment, where the delay is used as a tool to extract the statements, are not admissible. *People v. Mallory*, 421 Mich. 229, 241; 365 NW2d 673 (1985); *People v. Bladel*, 421 Mich. 39, 70; 365 NW2d 56 (1985).
>
> No facts have been offered to explain the delay in this case. The Court finds that the delay was for the purpose of extracting inculpatory statements. The statements made by Defendant on April 11 and April 12 were improperly obtained and must be excluded.

The opinion of the district court inexplicably does not mention that the April 11 and 12 statements had already been excluded by the state trial court. Withrow argues that Judge Hackett was "completely unaware" that the April 11 and 12 statements had already been excluded and were never introduced into evidence at the bench trial. Although the statements made on April 11–12 were not admitted against Williams at trial, our conclusion that the inculpatory statements made on April 10 should have been excluded still mandates a new trial. Furthermore, we are convinced that the

other evidence against Williams—without the April 10 statements—was insufficient to support a conviction.

The district court considered the applicability of *United States v. Wolf*, 879 F.2d 1320 (6th Cir.1989), which held that "the erroneous admission of an otherwise voluntary confession obtained in violation of the prophylactic rules of *Miranda* and its progeny can be harmless." *Id.* at 1323 (citations omitted). As *Wolf* was not a habeas corpus case, the district court was not required to address the harmless error issue. Under the U.S. Supreme Court's decision in *Arizona v. Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), however, harmless error analysis is applicable to the instant case. *Fulminante* held that the admission of an involuntary confession is subject to harmless error analysis. *Id.*, 111 S.Ct. at 1265.

 It is unclear, however, whether *Fulminante* should be applied retroactively to this case. In general, new rules are only applicable to habeas corpus cases in two narrowly defined instances: (1) if the new rule places an entire category of primary conduct beyond the reach of the criminal law; or (2) new "watershed" rules of criminal procedure necessary to a criminal proceeding's fundamental fairness. *Sawyer v. Smith*, —— U.S. ——, 110 S.Ct. 2822, 2831, 111 L.Ed.2d 193 (1990). Before *Fulminante*, the use of an involuntary confession to support a conviction was a due process violation whether or not evidence apart from the confession existed. It seems clear, then, that *Fulminante* "alter[s] our understanding of the bedrock procedural elements", 110 S.Ct. at 2831, therefore harmless error analysis must be applied.

 The district court applied harmless error analysis to the involuntary confession, and concluded that:

> There were no lawful confessions admitted in this case. Moreover, the other evidence against petitioner at trial, while substantial, was not massive or overwhelming. No witness was able to identify petitioner as being present at the

scene of the murders. Petitioner was linked by testimony to the murder weapon and to the victims. If, *arguendo*, harmless error analysis did apply to the admission of petitioner's inculpatory statements, this court could not find that admission of those statements was "harmless error beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

We are in agreement with the district court that the admission of the April 10 statements was not harmless error.

## IV

■ Finally, Withrow argues that custodial interrogation is not an appropriate issue for collateral review on petition for a writ of habeas corpus. Withrow cites to *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), which held that collateral relief in a habeas proceeding was not available for defendants raising fourth amendment search and seizure claims, when those defendants have had a full and fair opportunity to raise those claims in state court. Both in his brief and during oral argument, counsel for Withrow evinced considerable hostility toward the entire habeas system of review, but provided no support for extending *Stone v. Powell* to fifth amendment claims. Neither the Supreme Court nor any Courts of Appeal has ever indicated a willingness to do so. Moreover, it is extremely unlikely the Supreme Court will do so anytime soon, given its statement in *Fulminante* that " 'the ultimate issue of "voluntariness" is a legal question requiring independent federal determination.' " 111 S.Ct. at 1252 (citation omitted).

## V

The district court's grant of Williams' petition for a writ of habeas corpus is AFFIRMED.