16 F.3d 1219
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Tracy Cecil HAMMOND, Jr., Petitioner-Appellant,
v.
Pamela WITHROW, Warden, Michigan Reformatory, Respondent-Appellee.
 No. 93-1538.
 United States Court of Appeals, Sixth Circuit.
 Feb. 17, 1994.
 
 Before: MILBURN and BOGGS, Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Tracy Cecil Hammond, Jr., petitioner-appellant, appeals the district court's dismissal of his habeas corpus petition by respondent-appellee, Pamela Withrow, warden, Michigan Reformatory.
 
 I.
 
 2
 On March 22 through 24, 1988, petitioner was tried on a charge of first degree premeditated murder in the death of Cameron (Ron) Johnson. A jury trial was held in the Livingston County, Michigan Circuit Court. Petitioner was charged along with his cousin Mark Hammond in the death of Johnson. The defendants were granted separate trials as a result of a motion by petitioner for severance. During trial a motion for directed verdict was denied. Petitioner was convicted as charged. On April 29, 1988, he was sentenced to life imprisonment. After exhausting his state court remedies, petitioner filed a habeas corpus petition under 28 U.S.C. Sec. 2254 in the United States District Court for the Western District of Michigan on March 16, 1992. On February 17, 1993, a magistrate issued a report and recommendation, recommending that the petition be denied. The district court issued a judgment upholding the magistrate's report on April 8, 1993.
 
 
 3
 The murder at issue in the present case was committed on October 31, 1987. The deceased, Ron Johnson, was found beaten to death in a field. In a statement he made to the police, petitioner told the police that his cousin Mark Hammond proposed that they tell Ron Johnson, a drug dealer, that there was an opportunity to sell drugs at a party in Bath, Michigan, but that they actually take him to a secluded place and rob him of his drugs.
 
 
 4
 On the night of October 30, 1987, petitioner and Mark Hammond were at a party where petitioner was seen with a lead pipe, which it was known he always carried. Earlier in the evening, petitioner and Mark Hammond had visited with an acquaintance, Ms. Neganigijig, who testified at trial that petitioner stated that he might have to kill someone. After petitioner made this comment concerning the possibility of killing someone, Mark Hammond mentioned that they had business to do.
 
 
 5
 On the night of the party, petitioner and Mark Hammond left the party around midnight and picked up Ron Johnson and drove to a remote area near a church. After the three men left the car, petitioner alleged that Johnson knelt down as though he were going to reach for a weapon and charged at petitioner. Petitioner admitted that he hit Johnson at least once in the head with the pipe and possibly twice. He alleged that Mark Hammond then hit the victim with a piece of wood that broke over his head. Petitioner claimed that he, after hitting the victim, turned toward the car and that at this point, Mark Hammond grabbed the lead pipe from him and proceeded to beat the victim to death. The autopsy of the victim indicated he died from multiple blunt force injuries to the head with skull fractures and contusions and lacerations of the brain. Petitioner and Mark Hammond returned to the party between 3 and 3:30 a.m. on October 31, 1987. The party was at a house owned by Mark Hammond's girlfriend, Diane Richardson. Ms. Richardson testified at trial that petitioner told her that she was to say that petitioner had been at the house the entire night. Brenda Hodgson, petitioner's girlfriend, went with petitioner the next day on November 1, 1987 to the crime scene in order to retrieve the murder weapons and a jacket which had been left there.
 
 
 6
 Petitioner was arrested on November 4, 1987. After Miranda warnings were given, petitioner made a taped statement, which was played to the jury at trial. In the statement, he stated that he was not threatened or promised anything by anyone. He then described the incident as an attempted drug robbery that had gone wrong. He conceded that in discussing the robbery, Mark Hammond had warned him about the possibility that Johnson would have to be killed to prevent him from hiring someone to come after them. Petitioner stated, however, that he had objected to killing Johnson. Petitioner then explained how he and Mark Hammond had taken Johnson to the remote, secluded area and attempted to rob him. He stated that the victim had attacked him so he hit him once or twice on the head with a lead pipe. He then described how Mark Hammond had taken the pipe from him and continued to beat Johnson until he was dead. In his statement, petitioner described the victim as "kind of timid."
 
 
 7
 At trial, petitioner relied on two theories in defense. The first was self defense. The second was that Mark Hammond had the intention to kill Mr. Johnson and had duped petitioner into going along so that Mark Hammond could blame the murder on him. To support this theory, petitioner attempted to introduce at trial the testimony of John Budd, who was a homosexual who had had a past relationship with Mark Hammond. During the relationship, Budd had listed Mark Hammond as the beneficiary in his will. When the relationship between Mark Hammond and Budd was over, Hammond was removed from the will and was substituted by the victim, Ron Johnson, who had become Budd's lover. According to petitioner's theory, the reason Mark Hammond killed Ron Johnson was in order to get revenge for being taken out of the Budd will. Petitioner alleged that Mark Hammond duped him into thinking a robbery was taking place so that Hammond could kill Johnson and blame it on petitioner.
 
 
 8
 The trial court refused to allow Mr. Budd to testify, finding that the testimony of Budd was irrelevant, because petitioner's motive had already been established in the case. The testimony of Ms. Neganigijig indicated that petitioner made a clear statement on the night before the party of an intent to kill prior to the murder. Also petitioner in his taped confession acknowledged prior discussions with Mark Hammond on the possible need to kill the victim. Although petitioner stated that he had argued against the killing, he, nevertheless, went forward with the plan with the understanding that his cousin might attack the victim and severely injure or kill him. The trial court thus concluded that evidence of petitioner's motive had already been presented in the case and an attempt to show the motive of Mark Hammond was irrelevant to petitioner's motive. The trial court stated that Mark Hammond might have had two motives--the first, to rob and then silence the victim, and the second, to gain revenge. The court stated that even if petitioner had gone out to the secluded area with the intent to murder for a different reason than Mark Hammond, petitioner would still be guilty of first degree murder notwithstanding the fact that he was duped about Mark Hammond's real motive. In finding that Mark Hammond's motive was a collateral issue, the court stated, "You are trying to get inside the intent of Mark Hammond, his actions and activity, which is totally outside the realm of this trial." Therefore, the trial court granted the prosecutor's motion in limine to prohibit the testimony of John Budd, because it was irrelevant whether Mark Hammond had an ulterior motive or reason for the murder that differed from, or was unknown by, petitioner.
 
 
 9
 The district court in the present case found that the state trial court did not violate petitioner's federal constitutional rights and dismissed his petition for habeas corpus. Petitioner timely filed this appeal.
 
 II.
 
 10
 We must first decide whether the district court erred in concluding petitioner was not denied a fair trial by the trial court's exclusion of Budd's testimony, which would have indicated a possible additional or different motive for Mark Hammond to murder the victim. Petitioner argues that he was denied his right to present his defense at trial because he was prevented from introducing the testimony of Mr. Budd. Although it is a fundamental element of due process to give the defendant the right to present his witnesses at trial to establish a defense, Washington v. Texas, 388 U.S. 14, 19 (1967), a criminal defendant must also comply with the state's established rules of procedure and evidence. Chambers v. Mississippi, 410 U.S. 284, 302 (1973). Under the state rule of evidence, the state trial court found that Mr. Budd's testimony was not relevant, because it was being offered to establish that Mark Hammond had a motive to kill Ron Johnson that was different from petitioner's motive. The trial court concluded that Mark Hammond's motive was irrelevant because the relevant issue was whether petitioner had the requisite intent to kill Ron Johnson, regardless of whether Mark Hammond did or did not also have a motive.
 
 
 11
 Respondent argues that petitioner is attempting to have this court review a state court evidentiary ruling on the admissibility of evidence, which does not raise a federal constitutional question, and thus is not reviewable in a habeas corpus petition. Bell v. Arn, 536 F.2d 123, 125 (6th Cir.1976).
 
 
 12
 We agree. The admissibility of the evidence at issue does not raise a federal constitutional question because it did not violate petitioner's due process right to present a defense. The issue before the jury was whether the petitioner had the intent to kill Ron Johnson. The relevant question was not whether Mark Hammond had a motive and whether that motive was shared by petitioner, but whether petitioner had a motive as two co-defendants can clearly have distinct motives for committing a crime. Whether Mark Hammond may have had a different motive to kill the victim does not tend to prove or disprove whether petitioner also had a motive and the requisite intent to commit the crime. Even if Mark Hammond had a different unexpressed motive to kill Ron Johnson to get revenge for being replaced by Johnson in Budd's will, this motive would not disprove that petitioner also had the intent to kill and premeditated the murder. To conclude, we find that evidentiary rulings of state courts are not cognizable in habeas corpus cases unless the trial was rendered fundamentally unfair, which did not occur in the present case. Lundy v. Campbell, 888 F.2d 467, 469-70 (6th Cir.1989), cert. denied, 110 S.Ct. 2212 (1990). The district court is affirmed on this issue.
 
 III.
 
 13
 We must next determine whether the district court erred in concluding that petitioner was not denied due process by the denial of a new trial based on newly discovered evidence.
 
 
 14
 Petitioner contends that a new trial should have been granted based on newly discovered evidence because of information provided by his grandmother, Clara Hammond, and a statement made by Mark Hammond to a cellmate in jail. Petitioner states that his grandmother, who is also the grandmother of his cousin Mark Hammond, the co-defendant, was told by Mark Hammond that either Ron Johnson or Mr. Budd would pay for the fact that Mark had been taken out of Mr. Budd's will. This statement was made at the grandmother's house allegedly sometime in the summer of 1987, prior to the murder.
 
 
 15
 The trial court concluded that this statement of petitioner's grandmother did not qualify as newly discovered evidence under Townsend v. Sain, 372 U.S. 293, 317 (1963), because the statement of petitioner's grandmother could have been discovered earlier with the exercise of due diligence. We agree. The grandmother was known to petitioner and any statements made to her were reasonably available to petitioner before trial. Therefore, the failure to procure such testimony was the fault of petitioner and cannot be imputed to the state. Moreover, the testimony of Clara Hammond would only be used to buttress the evidence about the relationship between Mark Hammond and John Budd, which had already been ruled irrelevant.
 
 
 16
 Petitioner also claims that an exculpatory statement made by Mark Hammond, heard by his cellmate, constituted newly discovered evidence. According to the cellmate, Dennis Boywer, Mark Hammond had stated on several occasions that he had been the one who killed Ron Johnson and that petitioner was only taken along so that Mark Hammond would have someone to accuse if the murder were discovered. Also, the cellmate stated that Mark Hammond had explained how petitioner had only hit Ron Johnson once and then walked away, while Mark Hammond continued to beat him. Mark Hammond's comments were made allegedly sometime in January 1988, and the cellmate revealed them to petitioner in April 1988.
 
 
 17
 The trial court ruled that Mark Hammond's statements to the cellmate did not qualify as newly discovered evidence because they were cumulative. Under Townsend v. Sain, 372 U.S. at 317, the newly discovered evidence must be material and not merely cumulative or impeaching. We agree that the statements merely reiterate what the jury heard through petitioner's police statement. Even if Mark Hammond took petitioner along with him to have someone to blame the murder on, if petitioner, who struck the victim, also had the intent to kill, the fact that he was duped does not negate his motive.
 
 
 18
 Finally, under the new Supreme Court standard for admitting newly discovered evidence, petitioner's claim must fail. In Herrara v. Collins, 113 S.Ct. 853, 860 (1993), claims of actual innocence based on newly discovered evidence are not a ground for federal habeas relief absent an independent constitutional violation. In the present case, the testimony of the cellmate of a confession by Mark Hammond addresses only the guilt or innocence of petitioner and therefore cannot support a habeas petition. Moreover, in light of the substantial evidence against petitioner, it is unlikely that the testimony of the cellmate, which was deemed cumulative to petitioner's own confession and admissions, would have changed the outcome of the trial. Petitioner admitted transporting the victim to a remote location and hitting him in the head with a metal pipe. There was testimony he made a statement prior to the murder about being ready to kill someone; he admitted subsequent to the murder that he and Mark Hammond may have killed the victim.
 
 
 19
 To conclude, we believe that the allegedly newly discovered evidence addressed only the guilt or innocence of petitioner rather than an independent constitutional violation and thus is not grounds for federal habeas relief.
 
 IV.
 
 20
 Finally we must decide whether the trial court erred in concluding that there was sufficient evidence to support the conviction of petitioner for murder in the first degree.
 
 
 21
 The standard for review in evaluating an insufficiency of the evidence claim in a petition for habeas corpus relief, is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court must review the evidence and the inferences to be drawn therefrom in the light most favorable to the prosecution. Neal v. Morris, 972 F.2d 675, 678 (6th Cir.1992). The state does not have to rule out every hypothesis of guilt beyond a reasonable doubt, and the reviewing court need not be convinced of petitioner's guilt beyond a reasonable doubt. Id. at 677-78.
 
 
 22
 Under Michigan law, MCL Sec. 750.316, first degree murder is defined as a wilful, deliberate, and premeditating killing. According to People v. Garcia, 398 Mich. 250 (1976), the elements to be proven are premeditation, deliberation and the intent to kill. Premeditation and deliberation require that there be a thought process undisturbed by hot blood, and although the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable person time to subject the nature of the response to a second look. People v. Glover, 154 Mich.App. 22, 28-29, (1986).
 
 
 23
 Respondent argues that petitioner's statement to the police indicates that he intended to rob Ron Johnson of his drugs, and that he had a conversation in which Mark Hammond explained to him that in carrying out their plan to rob Mr. Johnson, it might also be necessary to kill him. To rebut petitioner's claim that he only wanted to hurt Mr. Johnson and did not intend to murder him, the prosecutor presented the testimony of Ms. Neganigijig, who stated that petitioner had seen her earlier on the night of the murder and stated that he was ready to kill someone. Moreover, at the party on the night of the murder petitioner was seen openly displaying the lead pipe that was later used to kill Johnson. In his confession, petitioner stated that he took the pipe with him on the night of the murder because he believed the situation might turn violent.
 
 
 24
 Although petitioner may have been more apprehensive about killing Ron Johnson than Mark Hammond was, we believe there was ample evidence from which to find that petitioner was nevertheless prepared to kill and did so. Apparently, the jury believed Ms. Neganigijig's testimony rather than petitioner's story. If all the evidence is taken in the light most favorable to the prosecution, the jury was entitled to conclude that the plot to rob Ron Johnson was planned beforehand and included discussion about the necessity of killing Johnson to avoid retaliation. Petitioner took the steps necessary to carry out the robbery by tricking the victim into exiting the car and by arming himself with the weapon which was ultimately used to kill Johnson, and which petitioner was aware could inflict severe harm. Petitioner admitted that he hit the victim in the head with his pipe at least once and possibly twice, and the victim died as a result of multiple blows to the head. Petitioner subsequently told others that he had hit the victim and that the cousins may have killed Johnson. They then disposed of the murder weapons in order to avoid detection. The jury, as the trier in fact, was entitled to make reasonable inferences from petitioner's discussion of the plan with Mark Hammond and from Ms. Neganigijig's statement that petitioner had made a clear statement of intent to kill prior to the murder and could conclude that such a statement proved premeditation and deliberation as well as intent. The jury was entitled to disbelieve petitioner's protestations that he did not intend to kill the victim based on the statement of Ms. Neganigijig, his actions in removing Ron Johnson to the remote area where he was slain with a weapon provided by defendant, and his statement that he administered a blow to the victim's head with a lead pipe.
 
 
 25
 For these reasons, we find there was sufficient evidence to convict petitioner of first degree premeditated murder.
 
 V.
 
 26
 Finally we must decide whether the district court erred in concluding that petitioner's statement to the police was freely and voluntarily given without threats or promises by the police.
 
 
 27
 Prior to trial, petitioner challenged the introduction of his taped confession, claiming that it was coerced. He argued that the police told him to cooperate or they would file charges against his girlfriend. He claimed the police told him that they already had her in custody. The trial court ruled that no such threats were made, based on petitioner's statement during the confession that no inducements of any kind were made by anyone. Also, the officer, who took the confession, testified that no such inducements or threats had been made and that petitioner's girlfriend had never been taken into custody.
 
 
 28
 Petitioner was granted a Walker hearing, which is a hearing held in the Michigan state courts, outside the presence of the jury, to determine whether a confession was voluntarily made. See People v. Walker, 374 Mich. 331 (1965). The ultimate issue is the voluntariness of the confession, Colorado v. Connelly, 479 U.S. 157, 164-66 (1986), which is a legal question requiring de novo review. Cooper v. Scroggy, 845 F.2d 1385, 1390 (6th Cir.1988).
 
 
 29
 The trial judge who conducted the Walker hearing made a finding of fact that the police did not tell petitioner that his girlfriend would be charged unless petitioner cooperated. This court must give a high level of deference to findings of fact by the state trial court. Williams v. Withrow, 944 F.2d 284, 288 (6th Cir.1991). Because the finding of fact of the state court, which this court must adopt, indicates there were no inducements offered for the confession, we must conclude there was no improper inducement rendering petitioner's confession involuntary. Furthermore, petitioner's own statement that no inducement had been made and the self-serving nature of his retraction of that statement support this conclusion. The district court is hereby affirmed on this issue.
 
 VI.
 
 30
 The judgment of the district court is AFFIRMED.