**UNITED STATES of America, Plaintiff,**

v.

**D–4 Phillip Edward HARPER, Defendant.**

**Criminal Action No. 95–50012–04.**

United States District Court, E.D. Michigan, Southern Division.

April 29, 1996.

Roger G. Isaac, Roger G. Isaac Assoc., Flint, MI, for Phillip Edward Harper.

Mark C. Jones, U.S. Attorney's Office, Flint, MI, for U.S.

## ORDER DENYING MOTION TO DISMISS COUNTS VIII AND IX OF THE SECOND SUPERSEDING INDICTMENT AND/OR TO SUPPRESS STATEMENTS

GADOLA, District Judge.

The defendant, Phillip Edward Harper, has been indicted and charged with: (1) conspiracy to distribute cocaine, cocaine base and marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1); (2) distribution of cocaine pursuant to 21 U.S.C. § 841(a)(1); (3) attempted possession with intent to distribute marijuana under the same statute; and (4) two counts involving the use of a firearm during and in relation to a felony drug offense under 18 U.S.C. § 924(c). On July 19, 1995, Harper moved to dismiss counts VIII

and IX of the superseding indictment on the ground that the evidence supporting these counts was based upon statements made without the benefit of *Miranda* warnings.[1] Counts VIII and IX charge Harper with attempted possession with intent to distribute marijuana under 21 U.S.C. §§ 841(a) and 846 and use of a firearm during and in relation to a felony drug offense under 18 U.S.C. § 924(c), based upon events occurring on November 3, 1994. In the alternative, Harper requested that all statements made without the benefit of *Miranda* warnings be suppressed.

At the first hearing on October 4, 1995, Harper clarified that the premise of his motion was not that he did not receive *Miranda* warnings before he made inculpatory statements relating to the drugs and guns underlying counts VIII and IX, but rather, that the statements he made after the *Miranda* warnings were involuntary and elicited by promises of leniency as to any charges based upon drugs or guns possession. Because the briefs and submissions did not directly address this question, this court adjourned the matter and scheduled an additional hearing on the question of involuntariness raised by Harper. On November 2, 1995, the parties appeared before this court and presented further argument on the issue, but failed to adduce any testimony or authority on the involuntariness question. The government did, however, register a formal objection to Harper's change of theory. This court requested that the parties submit briefs on the legal issues raised by Harper's involuntariness theory and communicated its interest in scheduling an evidentiary hearing to more fully develop the record as to the events of November 3, 4 and 5, 1994, which give rise to Harper's claims.

Harper submitted an affidavit on November 3, 1995, acknowledging that he signed a

---

**1.** At the time Harper's motion was originally filed, the counts at issue were numbered IX and X, respectively. On April 15, 1996, this court entered an order permitting the government to voluntarily dismiss counts I and VIII of the May 19, 1995 superseding indictment as to the deceased defendant, Lee Davis Strickland. Accordingly, the counts numbered IX and X in the May 19, 1996 superseding indictment have become counts VIII and IX. Moreover, the grand jury issued a second superseding indictment on November 3, 1995 consistent with the dismissal of Strickland. For purposes of consistency and clarity, this court will refer to the counts at issue in Harper's motion as counts VIII and IX, consistent with the second superseding indictment and the dismissal of the original count VIII against Strickland.

*Miranda* rights waiver form and attesting that his inculpatory statements about drugs and guns were elicited by assurances of leniency by the investigating officers. Harper also submitted a brief on November 20, 1995, relying primarily upon *Williams v. Withrow,* 944 F.2d 284 (6th Cir.1991) as support for his argument that his inculpatory statements should be suppressed. The government filed its response on January 8, 1996, challenging both the applicability of *Williams* to Harper's situation and the continuing viability of *Williams* in light of the Supreme Court's decision in *Withrow v. Williams,* 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). This court conducted an evidentiary hearing on March 7, 1996, at which testimony was taken from the investigating officers, Lieutenant Jerome Koger, Sergeant Theresa Stephens–Lock, Lieutenant James Harris and Sergeant Thomas Smith of the Flint Police Department. From that testimony and from the submissions of the parties, this court has uncovered the following facts which are relevant to the disposition of Harper's motion.

## I. Factual Background

On November 3, 1994, Harper was arrested by Lieutenant Jerome Koger of the Special Operations Bureau of the Flint Police Department and was taken into the custody of the Flint Police Department as a suspect in the murder of Willie Cummings, which occurred earlier that afternoon. The officers investigating the murder of Cummings had received information that Harper had been driving with Cummings in Cummings' automobile shortly before Cummings was found shot to death in that vehicle. Before conducting an interview, Sergeant Lock, the officer in charge of the Cummings homicide investigation, read the contents of a *"Miranda* Rights Waiver" form to Harper, which

Harper signed, indicating his consent to be interviewed at approximately 10:28 pm.[2] Harper's signature was witnessed by Sergeant Lock and by Lieutenant Koger and Sergeant Thomas Smith, who also signed the form.

During the initial portion of the interview, Harper related the following story. Harper claimed that he and Cummings were driving to a gun range to shoot a nine millimeter pistol and that they picked up Corey Crooms and an unidentified individual enroute to the range. Harper represented that these two passengers attempted to rob Harper and Cummings and that they shot Cummings. Harper escaped by leaping out of the moving automobile.

Skeptical of this story, both Sergeant Lock and Lieutenant Koger accused Harper of lying about the events surrounding the murder. Lieutenant Koger confronted Harper with his suspicion, related by a confidential informant, that Harper and Cummings were carrying weapons and were driving to buy marijuana when the shooting occurred. Lieutenant Koger then insisted that, no matter what story he told, Harper would face gun and drug charges related to the events earlier that day. Apparently, Harper and Lieutenant Koger exchanged some heated remarks and Lieutenant Koger ultimately exited the interview room.

As the interview continued, Harper persisted in his exculpatory gun range story. Sergeant Lock again accused him of lying and warned him that he would be "booked" for the murder based upon the circumstantial evidence, if he did not produce a truthful account of the events surrounding Cummings' death. Harper indicated that he wished to take a polygraph test regarding his involvement in the homicide and a polygraph

**2.** The *"Miranda* Rights Waiver" forms at issue present the following questions to suspects who are interviewed by the Criminal Investigation Bureau of the Flint Police Department:

    1. You have the right to remain silent. Do you understand this?

    2. Anything you say can and will be used against you in a court of law. Do you understand this?

    3. You have the right to talk with an attorney before making any statements. Do you understand this?

    4. If you do not have money to hire an attorney, one will be appointed for you and you have the right to remain silent until this attorney is present. Do you understand this?

    5. If you decide to discuss this, you may stop the interview any time you wish. Do you understand this?

    6. Do you wish to waive your right to have an attorney present, and discuss this matter?

examination was scheduled for the next day. Sergeant Lock indicated that, if the polygraph examination revealed that Harper was telling the truth about the events surrounding Cummings' death, he would not be charged with the murder. When Harper asked Sergeant Lock whether he needed an attorney, she informed him that he could have one if he wanted one. Sergeant Lock also expressed that she was not concerned with whether Harper's account of those events involved any drugs, because she was not investigating any drug charges. It is significant that, at no time did Lieutenant Koger indicate that he was not interested in prosecuting Harper on drug and gun charges. In fact, as aforesaid, Lieutenant Koger emphasized to Harper that, regardless of any story he told regarding the events of November 3, 1994, he would face drug and firearm charges arising from these events as well as a drug charge related to an offense that occurred in 1991.

Prior to the polygraph examination on November 4, 1994, Harper indicated to Sergeant Lock that he had not been truthful in his account of the events of November 3, 1994 and briefly explained that he and Cummings were involved in a drug transaction. Sergeant Lock advised Harper that she did not wish to discuss the matter until after the examination. Immediately before the polygraph examination, Lieutenant James Harris, the officer conducting the examination, read to Harper the contents of another "*Miranda* Rights Waiver" form. Harper signed this form, again acknowledging his consent to the examination. Lieutenant Harris emphasized to Harper that he needed to be truthful about what occurred on November 3, 1994, even if it involved drugs or made Harper "look bad" in any way.

During the examination, Harper admitted that he and Cummings did not intend to go to a gun range and that they were driving instead, to purchase $10,000 worth of marijuana. Harper explained that he and Cummings enlisted the help of Corey Crooms and the other unidentified individual to locate the marijuana. Harper further explained that he jumped out of the car when Crooms and the other individual, who were seated in the back seat of the car, demanded the money from Harper and Cummings. Harper claimed that Crooms and the other individual shot and killed Cummings.

Harper returned to the Flint Police Department again on November 5, 1995 to narrate a formal statement of the events he related during the course of the polygraph examination the day before. He was not advised of his *Miranda* rights for a third time because he was no longer a suspect in the homicide investigation and because he was merely reiterating the account of the events of November 3, 1994 that he related during the polygraph examination.

## II. Discussion

Initially, a brief discussion of the applicable precedent is warranted. As discussed above, Harper relies primarily on *Williams v. Withrow* in support of his motion to dismiss or to suppress. The government asserts that Harper's reliance on *Williams* is inappropriate because the Supreme Court has overruled it in *Withrow v. Williams,* 507 U.S. 680, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). This court has reviewed both decisions and has concluded that the Sixth Circuit's discussion of involuntary post–*Miranda* inculpatory statements in *Williams* is applicable to this situation. Contrary to the government's contention, this court is not convinced that the Sixth Circuit's conclusions on the merits of the involuntariness issue have been overruled by *Withrow.* In *Withrow,* the Supreme Court was reviewing the narrow procedural question of whether federal habeas relief is available to a state prisoner alleging that the evidence supporting his conviction was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where that prisoner had a full and fair opportunity to raise the claim in state court. The Sixth Circuit in *Williams* had allowed the claim, concluding that *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), restricts federal habeas actions only for claims under the Fourth Amendment and not for claims under the Fifth Amendment. 944 F.2d at 291 (section IV of opinion). The Supreme Court affirmed on this issue. Although the Supreme Court concluded that the district court erred in

considering Williams' involuntariness claim without permitting the government to present evidence bearing on that claim, the court expressly declined to express an opinion as to the lower courts' conclusions on the merits of the involuntariness claim. 507 U.S. at 696 n. 8, 113 S.Ct. at 1756, n. 8, 123 L.Ed.2d at 422, n. 8 ("Of course, we also express no opinion on the merits of the involuntariness claim."). Accordingly, there is no reason to believe that the Sixth Circuit's analysis of the voluntariness question has been discredited or overruled.

In *Williams,* police officers in Romulus, Michigan were investigating a murder that had occurred on April 6, 1985. Responding to a rumor, detectives went to the house of Robert Williams to question him on April 10, 1985. The detectives searched Williams, but did not handcuff him, and asked him to accompany them to the police station where the detectives questioned Williams for nearly 40 minutes before advising him of his *Miranda* rights. During that portion of the interrogation, Williams initially denied having any information about the murders. Prompted by assurances from the detectives that they were concerned only with finding the shooter and by threats of being formally charged, Williams admitted that he had supplied the murder weapon. At this point, Williams still denied being present at the scene of the crime.

Before a second round of interrogation began on April 10, 1985, the detectives read Williams his *Miranda* rights and Williams indicated his understanding of those rights. During that second portion of the interrogation, the following exchange occurred between Williams, Sergeant Early and Sergeant Ondejko:

Ondejko: Do you wish to change your story?

Williams: What difference is it going to make?

Ondejko: It's gonna make a lot of difference to you.

Early: I told you. If you told the truth . . .

Williams: I've been telling you the truth.

Early: Oh, you've been making up fairy tales ever since you've been in here. You're giving us, like he says, parts of the truth, parts of what you want us to believe, and part of what really happened.

Williams: If I tell you everything that happened, I'm gonna walk outta here, huh?

Ondejko: Someday you may stand a chance of walking.

Early: I'll make you a deal. You tell us everything that happened and you tell us the truth and I confirm it on a polygraph that you're telling us the truth. Yeah, you walk.

*Williams,* 944 F.2d at 286. Following this exchange, Williams admitted that he drove the shooter to the scene of the murder, that he turned his car around at the request of the shooter, that he heard shots and muzzle flashes, and that he drove the shooter away from the scene and helped dispose of the shooter's clothing and the murder weapon. Officer Early then elaborated on the deal he made with Williams:

Early: You're worried now about us turning around and charging you too. We've said that basically we want you as a witness. Right?

Williams: Yes.

Early: Alright. I'm gonna tell you right now, at the start of the recording, if we use this recording against you, it's got to be in its entirety. We can't edit or cut it. We told you if you are a witness to this and if you are telling the truth, and if you are willing to testify, then we are not going to charge you as a co-defendant. That's what we told you, right?

Williams: Yes.

Early: Alright. We're still gonna go by that agreement. And I don't [Abrupt stop.] You've been around, but if, whether you're up on the law, if a police officer makes an agreement like that it's got to be honored. You can go to court and say we made that agreement and we backed out on it and we can't present these tapes and use anything else we've got. So it's an agreement we have to

stick to by law. I can't promise you anything and then turn around and back out of it and use it against you.

Williams: O.K.

Early: Right now you're a witness to the crime. But we want the truth. If you start lying to us and you start playing games, yeah, we're gonna charge you. A witness doesn't do us any good unless he tells the truth. We're not trying to hang anybody with any made up testimony or anything but the truth. After you're done with this, we still gonna put you on a polygraph and you're gonna have to show us you're telling the truth. So that's the deal. You're telling the truth and you're not being charged. That fair enough?

Williams: Yeah.

*Williams,* 944 F.2d at 287. Contrary to this agreement, on October 29, 1985, Williams was convicted of two counts of first-degree murder and two counts of felony firearm charges in the Circuit Court of Wayne County, Michigan. Reviewing the district court's grant of Williams' habeas request, the Sixth Circuit concluded that "an evaluation of the entire course of police conduct in this case establishes that Williams' statements were not voluntary" within the meaning of *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). The court specifically found that Williams' statements were "conditioned on his belief that he would be released if he talked," and that the officers' promises of leniency were deliberately "intended to induce Williams' admissions." 944 F.2d at 289. The court reaffirmed that, even after *Miranda* warnings have been given, where promises of leniency, coupled with threats of immediate imprisonment, have the effect of coercing a suspect, a question arises as to whether that coercion was sufficient to overbear the will of the accused. *Id.* (citing *McCall v. Dutton,* 863 F.2d 454, 459 (6th Cir.1989)).

▮ As indicated above, Harper argues that the inculpatory statements he made during the course of his interviews with the Flint Police Department on November 3 and 4, 1994 were given involuntarily and in response to promises of leniency by Sergeant Lock. Harper submits that his heated exchange with Lieutenant Koger during the interview on November 3, 1994 involved threats by Lieutenant Koger that Harper would be prosecuted for drug trafficking. After Lieutenant Koger left the room, Harper maintains, Sergeant Lock continually advised Harper that she was not concerned with any drugs that may have been involved, but only with the identity of the shooter and the facts surrounding Cummings' death. Harper insists that, without these "continual promises of leniency," he would have remained silent or he would have requested the advice of counsel. Accordingly, Harper contends, the post-*Miranda* admissions he made during his interviews on November 3 and 4, 1994 were involuntary and should be suppressed.

As the preceding discussion indicates, the issue presented by Harper's motion is relatively straightforward. In analyzing whether Harper's post-*Miranda* inculpatory statements were involuntary, this court must determine whether, in light of the "entire course of police conduct" in this case, the statements made by Sergeant Lock or other officers of the Flint Police Department constituted promises of leniency and whether they were coercive to a degree and nature sufficient to "overbear" Harper's will. *Williams,* 944 F.2d at 289. Upon review of the affidavits, the testimony, the arguments and the relevant authorities, this court is not persuaded by Harper's involuntariness claims. Specifically, this court is unconvinced that the facts alleged by Harper and presented by the officers describe a course of police conduct which, in its totality, even remotely approaches the egregious conduct of the officers in *Williams.* To be certain, the facts in this case are materially distinguishable from the situation described in *Williams.*

Initially, this court notes that there is no evidence in the record to suggest that Sergeant Lock, or any other officer of the Flint Police Department, made any specific promises of leniency concerning drug or firearm charges to Harper at all. As the testimony of all of the officers demonstrates, and as Harper admits, Sergeant Lock represented

that, as the officer in charge of investigating the murder of Cummings, she was only interested in the facts surrounding that homicide, regardless of whether those facts involved drugs or guns. At no point during her discussions with Harper, however, did Sergeant Lock explicitly promise that Harper would not face charges based upon the possession of any drugs or guns in connection with the Cummings' homicide. Lieutenant Koger, on the other hand, explicitly and unmistakably assured Harper that he intended to pursue the prosecution of drug and firearms charges arising from the incidents of November 3, 1994 as well as an incident occurring in 1991, irrespective of the content of Harper's statements to Sergeant Lock.

This court recognizes that the question of whether particular representations by an officer in the conduct of an investigation constitute promises of leniency is ultimately, like many thorny legal questions, one of degree. This court is convinced, however, that the statements made by Sergeant Lock concerning her interest in the homicide investigation do not rise to the level of a continual, or single, promise of leniency on any gun or drug charges. In this court's estimation, these statements do not bear so much as even a remote resemblance to the direct, explicit and unequivocal promises made by the officers in *Williams.* 944 F.2d at 286–87.[3]

■ Moreover, even if this court assumes that Sergeant Lock's statements could be interpreted to constitute promises of leniency, this court is not convinced that these vague promises would be sufficient to "overbear the will of the accused." *See Williams,* 944 F.2d at 289. Harper acknowledges that Lieutenant Koger explicitly advised him that he suspected him of drug trafficking and that, regardless of what he said to Sergeant Lock, he would face charges for any guns

and drugs involved on November 3, 1994 as well as for a drug incident occurring in 1991. Moreover, it is clear from the record that Harper received, and affirmatively acknowledged that he understood, his *Miranda* rights prior to the interview on November 3, 1994 and the polygraph examination on the following day. Finally, Harper's reticence to divulge the incriminating information indicates that he fully understood the consequences of these statements. In view of the totality of these circumstances, this court cannot reasonably conclude that the alleged promises of leniency made to Harper would suffice to overbear Harper's will. *See McCall v. Dutton,* 863 F.2d 454, 460 (6th Cir.1988) (relying on similar factors to conclude that the accused's will was not overborne by the alleged "coercion.")

### III. Conclusions

In the final analysis, this court is satisfied that Harper voluntarily made inculpatory statements about guns and drugs to officers of the Flint Police Department on November 3 and 4, 1994 because he believed that those statements were necessary to pass the polygraph examination (that he requested) and to be released from suspicion for the murder of Willie Cummings. It simply cannot be said that Harper's statements were elicited by representations rising anywhere near the level of the express and unambiguous promises of leniency discussed in *Williams.* The testimony and affidavits sufficiently demonstrate that neither Sergeant Lock nor any other officer of the Flint Police Department made any promises to Harper that his inculpatory statements about guns and drugs would not be used against him in any prosecution for firearm or drug possession on November 3, 1994. The evidence also demonstrates that, even if the statements of Ser-

---

**3.** In his attempt to create a factual affinity between the facts in *Williams* and his own situation, Harper relies upon the statements made by the officers in *Williams* that they were only interested in finding the shooter. 944 F.2d at 286. This reliance is misplaced. As the discussion in *Williams* demonstrates, the court's analysis of the voluntariness question did not specifically address the comments made by the officers during the first portion of the interrogation on April

10, 1985. Indeed, in its discussion of the voluntariness question, the court examined only those statements made after Williams was advised of his *Miranda* rights. *Williams,* 944 F.2d at 289. As such, *Williams* cannot be read, as Harper suggests, to imply that, in isolation, the statements by Sergeant Lock, indicating that she was interested only in the homicide, constituted promises of leniency. Harper is comparing apples and oranges.

geant Lock and Lieutenant Harris could be construed to constitute promises of leniency on firearm and drug charges, these statements, by themselves, were not sufficient to overbear Harper's will. Harper's motion to suppress his inculpatory statements and/or to dismiss counts VIII and IX of the second superseding indictment, which are based in part upon these statements, must be denied.

### ORDER

Therefore, it is hereby **ORDERED** that the defendant's motion to dismiss Counts VIII and IX of the second superseding indictment (Counts IX and X of the May 19, 1995 superseding indictment) and to suppress evidence relating to those counts is **DENIED**.

**SO ORDERED.**